UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | | |
|---|---|---|
| HOWARD F. HUSUM, JR.,<br>Plaintiff, | : | 2006 Civ. _____ (_____)<br>**06 -CV- 1402** |
| -against- | : | **COMPLAINT**<br><br>**GLS / RFT** |

RAYMOND J. RICHARDSON (in his personal,
individual, and/or public official capacity),
JOHN BACHELLER (in his personal, individual,
and/or public official capacity),
JOSEPH LACIVITA (in his personal,
individual, and/or public official capacity),
ROBERT REGAN (in his personal, individual,
and/or public official capacity),
JOHN DOE, RICHARD ROE,, ETC.,
TO BE NAMED AFTER DISCOVERY
(in his/her/their personal, individual, and/or public
capacity),
THE NYS DEPARTMENT OF ECONOMIC
DEVELOPMENT,
THE NYS EMPIRE STATE DEVELOPMENT
CORPORATION,
NYS EMPIRE STATE DEVELOPMENT, AND
THE STATE OF NEW YORK,

**PLAINTIFF DEMANDS
TRIAL BY JURY**

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

NOV 2 0 2006
# 350. Paid.
LAWRENCE K. BAERMAN, CLERK
ALBANY

Summons Iss'd.
(ωL)

Defendants.

-----------------------------------------------------------X

PLAINTIFF, HOWARD F. HUSUM, JR., acting Pro Se, for his COMPLAINT herein,

alleges as follows:

## JURISDICTION AND VENUE

1. This Honorable Court has original jurisdiction over the subject matter of this action by

reason of:

(a) 28 U.S.C. 1331 and 28 U.S.C. 1343 in that this action presents claims arising under the Constitution and Laws of the United States, to wit: (1) The Racketeer Influenced and Corrupt Organizations Act of 1970 (hereinafter "RICO"), 18 U.S.C. 1961 through 1968; (2) 42 U.S.C. 1983; (3) 42 U.S.C. 1985; and (4) other federal Constitutional provisions and federal statutes as set forth hereinafter;

(b) principles of ancillary and/or pendent jurisdiction in that, inter alia, the common law and/or statutory claims brought under NY law are so related to the federal claims, over which the Court has original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution pursuant to 28 U.S.C. 1367.

2. This action is brought under and pursuant to applicable federal and/or state statutory and/or common law.

3. Venue is based upon 28 U.S.C 1391 and 18 U.S.C. 1965 in that, inter alia, the events giving rise to the claims stated herein occurred in this District and all defendants are subject to the in personam jurisdiction of this Court in that, inter alia, they each reside and/or have a place of business in this District, and are each, either directly or through an agent, doing business in this District and in this State.


## THE PARTIES

4. Plaintiff HOWARD F. HUSUM, JR. (hereinafter "plaintiff") is a citizen of, and resides in, this District, having his home address in Troy, NY, and has done so at all times relevant herein. Plaintiff was first employed by defendant NYS Department of Economic Development "as part of Empire State Development" on August 11, 2005. Plaintiff was,

pursuant to the "paperwork" work supplied to him at the time of his appointment/hiring,

"appointed"/employed in the NYS Department of Economic Development as part of

NYS Empire State Development to the exempt class position of Assistant Counsel, NS,

effective August 11, 2005, which position was designated/denominated by such

"paperwork" as "Managerial/Confidential". In point of fact, this "paperwork" was a total

fiction. In fact, fact, plaintiff was hired/appointed in a purely "business" capacity as a

"Director of Industry Development, Strategic Business Division, Empire State

Development Corporation, 30 South Pearl Street, Albany, New York 12245", which, in

fact, was recited verbatim in the Business Cards which were provided to plaintiff by

defendants, which Business Cards plaintiff was expected by defendants to "hand out" to

all Project Clients he worked with in the course of his employment. Plaintiff serves at the

pleasure of the Governor. Plaintiff is paid by the State of New York via checks issued by

NYS Comptroller Alan G. Hevesi.

5. Defendant Raymond J. Richardson, on an "organizational chart" basis, is Second-In-

Command at the NYS Economic Development Organization headquartered at 30 South

Pearl Street, 7th Floor, Albany, NY as that term is defined in paragraph 12 below. Upon

information and belief, Defendant Richardson is a citizen of, and resides in, the State of

New York and in this District, and does business in his above public official capacity,

and in his personal, individual, and private capacity, in this District either directly and/or

through agents and/or appointees. Defendant Richardson serves at the pleasure of the

Governor. This defendant is being sued in his personal, individual, and/or public officer

official capacity as an agent of the State of New York

3

6. Defendant John Bacheller, on an "organization chart" basis, is the First-In-Command Chief at the NYS Economic Development Organization headquartered at 30 South Pearl Street, 7th Floor, Albany, NY as that term is defined in paragraph 12  below. Upon information and belief, Defendant Bacheller is a citizen of, and resides in, the State of New York and in this District, and does business in his above public official capacity, and in his personal, individual, and private capacity, in this District either directly and/or through agents and/or appointees. Defendant Bacheller serves at the pleasure of the Governor. This defendant is being sued in his personal, individual, and/or public officer official capacity as an agent of the State of New York

7. Defenant Joseph LaCivita, upon information and belief, is a Deputy Commissioner of Administration and Chief of the Human Resources Management Offices Department of the NYS Economic Development Organization headquartered at 30 South Pearl Street, 7th Floor, Albany, NY as that term is defined in paragraph 12 below. Upon information and belief, Defendant LaCivita is a citizen of, and resides in, the State of New York and in this District, and does business in his above public official capacity, and in his personal, individual, and private capacity, in this District either directly and/or through agents and/or appointees. Defendant LaCivita serves at the pleasure of the Governor. This defendant is being sued in his personal, individual, and/or public officer official capacity as an agent of the State of New York.

8. Defendant Robert Regan, upon information and belief, is the General Counsel, Attorney-In-Chief, and Deputy Commissioner of the NYS Economic Development Organization headquartered at 30 South Pearl Street, 7th Floor, Albany, NY as that term is defined in paragraph 12 below. Upon information and belief, Defendant Regan is a

citizen of, and resides in, the State of New York and in this District, and does business in his above public official capacity, and in his personal, individual, and private capacity, in this District either directly and/or through agents and/or appointees. Defendant Regan serves at the pleasure of the Governor. This defendant is being sued in his personal, individual, and/or public officer official capacity as an agent of the State of New York

9. Upon information and belief, defendants "John Doe", "Richard Roe", and other individuals to be named after discovery and/or after their deposition testimony and added as defendants hereunder, are public officials of the NYS Economic Development Organization headquartered at 30 South Pearl Street, 7th Floor, Albany, NY as that term is defined in paragraph 12 below. Upon information and belief, such yet-to-be-named defendant(s) is/are (a) citizen(s) of, and reside(s) in, the State of New York and in this District, and do/does business in his/their relevant public official capacity, and in his/their personal, individual, and private capacity, in this District either directly and/or through agents and/or appointees. Such yet-to-be-named defandants serve(s) at the pleasure of the Governor. These defendants will be sued in his/their personal, individual, and/or public officer official capacity as an agent(s) of the State of New York.

10. Defendant The NYS DEPARTMENT OF ECONOMIC DEVELOPMENT "as part of Empire State Development" ("NYS DED") is an economic development agency for the State of New York, with headquarters at 30 South Pearl Street, 7th Floor, Albany, NY.

11. Defendant The NYS EMPIRE STATE DEVELOPMENT CORPORATION ("ESDC") is an economic development agency for the State of New York, with headquarters at 30 South Pearl Street, 7th Floor, Albany, NY.

12. Defendant NYS "Empire State State Development" is an economic development

agency for the State of New York, with headquarters at 30 South Pearl Street, 7th Floor,

Albany, NY. Upon information and belief, defendants NYS DED and ESDC are related

NYS public governmental entities falling under the identical NYS public entity rubric

and doing business together as "Empire State Development", being different means of

describing the self-same NYS Economic Development Organization reporting to the

Governor of the State of New York, the purpose of which NYS Economic Development

Organization is to implement the Governor's economic development initiatives and

objectives for the State of New York (these related entities are hereinafter collectively

referred to as the "NYS Economic Development Organization").

13. Defendant THE STATE OF NEW YORK (the 'STATE") has its headquarters in

Albany, NY under the name "Office of the Governor of New York State", and resides in,

this District, and/or conducts its business in this District directly and/or through its

agents and/or appointees. The STATE does business in this District via the Governor, via

the NYS Economic Development Organization, and via other agents, appointees, and/or

public NYS agencies and/or public officials. The STATE controls, runs, and manages the

NYS Economic Development Organization, and its constituent parts, NYS DED and

ESDC.

## OVERVIEW OF CERTAIN ELEMENTS OF THE COMPLAINT

14. As more fully set forth below, inter alia, and without limitation, plaintiff has been the

victim of a disgusting miscarriage of justice at the hands of the corrupt senior

management of the NYS Economic Development Organization headquartered in Albany,

NY. Pursuant to their extortion conspiracy against plaintiff, more fully described below,

plaintiff was wrongfully discharged/fired on October 11, 2006 for a simple reason: (a) plaintiff put on the record a legitimate workplace grievance against a member of the Albany ESD senior management; (b) in response, the Albany ESD senior management demanded that plaintiff sign what can only be accurately described as an "Extortion Document" (see paragraph 43 below and Exhibit 3 hereto) pursuant to the terms of which plaintiff would be compelled to recant and repudiate all of his workplace grievance charges against such senior official and give all of senior management general releases (with no concomitant protections for plaintiff); and (c) in retaliation against plaintiff for his refusal to accede to their extortionate demands that plaintiff sign the "Extortion Document", which they demanded that plaintiff sign upon penalty of being fired if plaintiff refused to do so, they wrongfully discharged/fired plaintiff solely in retaliation against plaintiff for his refusal to sign the Extortion Document and for his refusal to abdicate, inter alia, his 1st Amendment and 5th Amendment constitutionally-protected right to protest, as a matter of public concern, their wrongful, criminal, and corrupt extortion conspiracy.

## BACKGROUND FACTS AND/OR ALLEGATIONS

15. Plaintiff was employed/appointed to serve, at the pleasure of the Governor, on behalf of the NYS Economic Development Organization headquartered at 30 South Pearl Street, 7th Floor, Albany, NY, on August 11, 2005 (such Albany Office is hereinafter referred to as the "Albany ESD Office"). At that time and prior to that, defendant Raymond J. Richardson (hereinafter referred to as "RR"), among others, was aware that plaintiff had moved from New York City (where plaintiff had practiced law in the private sector from 1975 until October, 2004) to Troy, NY in October, 2004 for "life-style change" reasons,

had been unable to find gainful employment from October, 2004 until August 11, 2005 in the Albany Metropolitan Area because plaintiff was then a 55 year old attorney (is now 56), did not have any "portable" legal business to bring to a law firm in Albany, and, therefore, had found it quite difficult to find gainful employment in the Albany area. At that time, defendant RR, among others, was aware that plaintiff was in a desperate financial condition, and desperately needed to find gainful employment given his then financial situation.

16. Even before plaintiff was hired/appointed to serve/work at the Albany ESD Office, plaintiff was aware that defendant RR was, or could easily become, unbalanced, unstable, and irrational. For example, before plaintiff was hired/appointed on August 11, 2005, in a telephone conversation between plaintiff and RR, plaintiff, desiring to give some phone numbers or something of that sort to RR, innocently asked RR: "Do you have a pencil handy?". RR responded, with irrational anger and vehemence in his voice: "Do I have a pencil?", thereby implying/insinuating to plaintiff that plaintiff had better not dare to speak to RR except in the most deferential terms imagineable.

17. Plaintiff took this incident to heart because, as set forth above, plaintiff desperately needed a job. Therefore, from then on until August 24, 2006 (see infra), plaintiff always treated RR with the greatest courtesy, dignity, and respect. In fact, plaintiff always (until August 24, 2006) went out his way to compliment, praise, and laud RR in connection with things that RR was not, in fact, entitled to be complimented, praised, or lauded for. Plaintiff was never "insubordinate" to RR because plaintiff was, at all times, fearful that RR would react in an unbalanced, unstable, and irrational manner, putting plaintiff in a constant state of fear that RR might, on some arbitrary whim, fire plaintiff.

18. Accordingly, in order to protect his job, which was a financial necessity to plaintiff, plaintiff, at all times (until August 24, 2006), "appeased" RR so as to protect plaintiff's job. Plaintiff was always subservient to, cow-towing to, complimenting, showing respect to, never questioning, never challenging, always flattering RR in order that plaintiff might not put his job in jeopardy by "triggering" RR's unbalanced, unstable, and irrational nature. Sensing from the start that RR was inherently unbalance, unstable, and irrational, like a ticking bomb just waiting for the slightest trigger to go off, plaintiff always was deferential to RR, complimented RR, treated RR with utmost respect, so as to protect his job.

19. When plaintiff was given a substantive business assignment, plaintiff met with RR and David Ahl, a Deputy Commissioner at the Albany ESD Office, and RR said words to this effect: "Howard, Dave is the Quarterback; you follow his instructions and directions and report directly and solely to him". Thereafter, as instructed, plaintiff reported solely to David Ahl, who was plaintiff's "Boss". Thereafter, plaintiff never reported to RR, except via David Ahl (plaintiff's Boss) on any matter, never directly did any work for RR, and never had any direct substantive ESD business dealings with RR concerning plaintiff's work being done in the Albany ESD Office. David Ahl was plaintiff's sole and only "Boss" and plaintiff reported solely and only to David Ahl.

20. From August 11, 2005 until plaintiff was wrongfully discharged/fired in October, 2006, in retaliation against plaintiff for plaintiff's refusal to sign the Extortion Document more fully described below, plaintiff's work performance was excellent, exemplary, and beyond criticism, as was plaintiff's work ethic in doing the best possible job he could to create and/or retain jobs in NYS, and to assist major economic development

Projects/Undertakings to succeed in NYS. Indeed, pursuant to a NYS Department of

Economic Development Management/Confidential Merit Awards Program, by

nomination/recommendation dated March 6, 2006, defendant RR, upon information and

belief, at the request of David Ahl (plaintiff's Boss), nominated plaintiff for a Cash Merit

Award, which plaintiff subsequently received. Such Nomination, signed by defendant RR

on March 6, 2006, stated, in part, as follows: "In pursuit of his assigned business

development initiatives, [plaintiff] has demonstrated an exceptional diligence and

perseverance in the performance of his duties. He has established that he is willing and

able to assume exceptional responsibility in order to get the job done well and in a

professional manner. He has exhibited an exceptionally strong work ethic, working early

mornings, late evenings, and weekends in order to assist the Department in meeting

deadlines. In addition to the fine performance of his primary duties, he has evidenced an

exceptional willingness to pitch in and help other Department members meet their project

deadlines in an exemplary showing of teamwork in action" (a copy of such Nomination is

annexed hereto in Exhibit 1).

21. Sometime prior to, or in or about June, 2006, plaintiff was moved from his prior

office on the 7th Floor to the office right next to the corner office of RR on the 7th Floor.


## SUBSTANTIVE ACTIONABLE FACTS AND/OR ALLEGATIONS – PART I

### A: TORT WRONGDOING BY DEFENDANT
### RR IN HIS INDIVIDUAL AND PERSONAL CAPACITY

22. **FIRST ATTACK:** On Friday, June 16, 2006, RR called plaintiff into his corner office and told plaintiff to shut the door. RR then proceeded to go into a totally unjustified and unjustifiable diatribe/shouting rage at plaintiff about the following:

(a) That one day that week, plaintiff had had "bird-shit" on the back of his shirt (plaintiff and his ex-wife, who lives with plaintiff, have birds as pets and it is plaintiff's habit to "play" with those birds in the morning prior to going to work, and sometimes, without plaintiff's knowledge, the birds "go to the bathroom" on plaintiff without plaintiff being aware of it), and that plaintiff had dared, upon being informed of this "stain" (which plaintiff had not been aware of), to ask a co-worker to help him locate the "stain" and attempt to remove it. RR said, or words to this effect, to plaintiff: "How dare you ask your co-worker to help you get rid of this stain – you should have run into the bathroom, removed your shirt, and washed it off/out yourself". Plaintiff replied that plaintiff had not thought of that because he had a great relationship with his co-worker in question, and she was quite happy to help him out in locating the stain (which had hardened and could not be removed in any event; so plaintiff simply put on his suit coat to hide the stain), which plaintiff could not see himself. RR ignored plaintiff's response and went on to his next mental/emotional/psychological attack, alleging as follows;

(b) RR then began raving, he was actually beginning to shake now and turn purple/red, that plaintiff had "flirted" with two women, the identities of which RR refused to disclose to plaintiff. Plaintiff responded that he had done nothing improper with any woman, and again asked who these alleged women were. RR again refused to disclose their identifies, and just got madder and madder, like a madman, thereby implying/insinuating that RR was on the verge of firing plaintiff, and thereby

intentionally putting that fear of firing in the mind of plaintiff in order to intimidate

plaintiff and cause plaintiff to fear that RR might fire plaintiff for no reason other than

RR's sadistic, unbalanced, unstable, and irrational whim -- thereby, with no legitimate

justification, intentionally inflicting upon plaintiff severe mental, emotional, and

psychological distress in a blatantly sadistic and egregious manner;

(c) next, continuing his tirade and diatribe, RR raved that plaintiff's suits don't fit

right, which is not true;

(d) then, continuing his tirade, RR raved that plaintiff's hair was sloppy and

unprofessional, which is also not true -- plaintiff's hair was in the same status it was

when plaintiff was originally hired;

(e) in response to the above, as deferentially and as meekly as possible, since he

did not want to be fired and was being put in the real fear of being fired, plaintiff

explained to RR, as nicely as plaintiff could, that some of plaintiff's clothes/wardrobe no

longer fit because, as plaintiff had already told RR, plaintiff had been seriously depressed

over the prior winter (which did not affect plaintiff's work performance one iota) and

plaintiff had gained some weight. Plaintiff also explained to RR, as nicely as possible,

that he had been taking prescribed anti-depressant medication (which RR already knew)

and that such medication had solved the problem and that plaintiff was feeling much

better;

(f) not willing to stop, and still in a rage, RR said he "did not give a damn about

your [plaintiff's] personal life", and then he began to rave about plaintiff's discussing his

personal life with people around the office, which was absolutely none of his darn

business;

12

(g) during the course of this personal attack on plaintiff and tirade against plaintiff, RR never once criticized plaintiff's job performance or professional work ethic; indeed, RR could not do so and had no basis to do so. RR just "picked" on plaintiff about every little non-job-related scrap/thing RR could think of.

23. After this attach by RR on plaintiff, plaintiff spoke with his Boss, David Ahl, and strenuously complained about RR's unjustifiable behavior, which plaintiff explained in detail to David Ahl. David Ahl responded that "RR could be irrational" and that RR had once been charged with sexual harassment in the workplace involving his use of his power and intimidation over a subordinate woman, and, therefore, David said: Don't take it seriously – RR was probably just over-reacting when RR heard something from somebody (RR refused to ever divulge his sources) about plaintiff's alleged "flirting" with women. David Ahl was, in effect, "covering" for and trying to protect RR from a workplace grievance from plaintiff.

24. **SECOND ATTACK:**

(a) On June 19 or June 20, plaintiff went from his 7th Floor office right next to RR down to an empty office in the 6th Floor Legal Department (which had empty offices on either side of it as well) to make a private call in order to attempt to settle a private litigation matter which plaintiff was involved in and could not avoid (plaintiff had to make the call during the day at work because the opposing attorney was only available to talk to during normal business working hours; and the call only took five (5) minutes). Plaintiff decided to make this private call from an empty office in the Legal Department on the 6th Floor for two reasons: (1) RR demanded a library-like silence is his 7th Floor Domain. Plaintiff, on the other hand, knew that, as is the case with all attorneys involved

in settlement negotiations, he would have to "raise his voice" in order to obtain the

settlement plaintiff wanted from the opposing attorney. Therefore, plaintiff chose to go

down to the 6th Floor to make the call so as not to "disturb" the library-like atmosphere

which RR imposed on the 7th Floor; and (2) the walls between plaintiff's office and the

office of RR are paper-thin, and plaintiff's private matter was none of RR's darn

business;

      (b) RR somehow (plaintiff will never know how) found out about plaintiff's five

(5) minute personal call from an empty office in the 6th Floor Legal Department, and

again, on Tuesday, June 20, 2006, attacked plaintiff for the second time, which attack

was even escalated in intensity above and beyond the prior June 16 attack. On Tuesday,

June 20, 2006, RR again called plaintiff into his corner office and told plaintiff to shut the

door. RR then proceeded to go into a totally unjustified and unjustifiable

diatribe/shouting rage at plaintiff (even worse than the prior one on June 16) described as

follows:

      (1) In the nastiest voice and tone he could summon and conjure up, RR

said to plaintiff: "What in hell were you doing down on the 6th Floor". He continued to

rant that somebody (he refused to tell plaintiff who) reported to him that plaintiff was

down on the 6th Floor in a vacant Legal Department office making a call, and that

plaintiff dared to raise his voice and "disturb" unidentified persons on the 6th Floor (RR

refused to tell plaintiff who was "disturbed" or who reported this incident to RR). This is

total nonsense because plaintiff was good friends with all the attorneys on the 6th Floor,

and they could care less if plaintiff made a little noise in a five (5) minute phone call on

the 6th Floor;

(2) next, totally irrational now, RR accused plaintiff of **"Taking Down Names in the Legal Department" (that is an exact verbatim quote of what RR said to plaintiff).** Plaintiff asked RR to explain this totally irrational statement, and RR absolutely refused to do so. Plaintiff responded: This is not reasonable, what are you really talking about? Plaintiff said that he visited Bill Osta and Tom Regan (two attorney in the Law Department on the 6th Floor) all the time, and that they were plaintiff's friends;

(3) by this time, RR is really steaming with rage. He gives plaintiff a direct order, quoted verbatim: "Never go down to the Legal Department again – if you want to talk to Bill Osta or Tom Regan, make an appointment with them on the phone, and see them outside this Building";

(4) **By this time, RR is livid, red-faced, and shaking, like he has the palsy or is having some kind of epileptic seizure. He is acting totally nuts, like a total nut-case;**

(5) **RR continues by saying to plaintiff, and this is a direct quote: "Now you have really ticked me off – YOU DON'T WANT TO TICK ME OFF OR YOU WILL BE OUT OF HERE LIKE A MATCH IN THE WIND".**

25. The above attack, and torrent of abuse, is triggered by nothing more than an innocent five (5) minute private phone call that plaintiff made from the 6th Floor.

26. Plaintiff then complains, in detail, to his Boss, David Ahl, about this disgusting incident, but David Ahl just says that RR is a little crazy and offers plaintiff no help in the matter, despite that fact that plaintiff tells David Ahl that plaintiff is terrified of being fired by RR on his insane, sadistic whim, for no legitimate reason.

27. After the two attacks described above, plaintiff could not sleep at all the nights of 6/20, 6/21, 6/22 and thereafter. The night of 6/22, at about 4 AM (actually the early morning of 6/23), plaintiff went to his Albany ESD office to remove all of his personal things – because he was terrified of being fired, and of the terrible financial consequences such firing would cause to plaintiff. Plaintiff was, at that time and thereafter, terrified of being irrationally wrongfully discharged/fired at the sadistic whim of RR for no just or legitimate cause or reason, just at the sick and twisted and malicious and sadistic whim of RR. Plaintiff's terror was increased by the fact, as RR well knew, that plaintiff had moved from NYC to Troy, NY in October, 2004 and could not get a job thereafter until August, 2005. RR was also aware, at all relevant times, that plaintiff was looking for a new job as of January 1, 2007 since plaintiff's job was put in jeopardy by the change in administrations since plaintiff served at the pleasure of the Governor, and RR was, at all relevant times, fully aware that plaintiff's new job search was going nowhere fast.

28. Plaintiff was physically ill because of this mental/emotional abuse/attack spewed forth by RR over the  June 24-25 weekend.

29. **THIRD ATTACK:** The **Third (3rd)** major incident of abuse by RR against plaintiff occurred sometime after June 20, 2006 in later June or July, 2006. RR came into plaintiff's office and demanded that plaintiff give RR plaintiff's blackberry/cell phone. By this time, plaintiff was so intimidated by RR that plaintiff gave the blackberry to RR, fearing that plaintiff would be fired based on the pretext of "insubordination" if plaintiff refused to accede to RR's demand (RR, who is the Chief of the Strategic Business Division of Empire State Development in the Albany ESD Office, and the Second-In-Command at the Albany Office, assuming arguendo that he needed a blackberry, could

easily have called the Albany ESD MIS Department and demanded an immediate

blackberry, instead of picking on plaintiff). Then the following transpired:

(a) after RR left the office with plaintiff's blackberry, plaintiff joked to two co-

workers, both of whom witnessed the entire incident, as follows: "I hope Bubbles and

Trixie don't call while Ray has my blackberry !!!". They both laughed and thought it was

quite funny;

(b) RR came back with plaintiff's blackberry/cell phone about an hour or so later,

putting in on plaintiff's desk and saying "Here". Trying to make the best of the incident,

plaintiff again joked, this time to RR, who was then two feet away from plaintiff, that

plaintiff hoped that Bubbles or Trixie had not called while RR had plaintiff's

blackberry/cell phone, thinking that RR would at least find this amusing, or even laugh.

**RR did not. Instead, he totally ignored plaintiff as if plaintiff did not even exist, and**

**walked out of plaintiff's office, period. RR treated plaintiff like a total NOBODY-**

**NON-ENTITY;**

(c) Plaintiff has no means to ascertain why RR took plaintiff's blackberry and

what RR did with it. Plaintiff asserts, however, that this incident constitutes, at minimum,

an actionable invasion of privacy in that RR had no right of access to plaintiff's

blackberry to invade plaintiff's privacy by looking at plaintiff's emails, address book,

call records, etc. stored in plaintiff's blackberry, which records all emails sent and/or

received by or from plaintiff's mainframe work computer.

30. **FOURTH ATTACK:** The **Fourth (4rth)** major incident of abuse by RR against

plaintiff occurred on August 23, 2006 and is set forth as follows:

(a)  Plaintiff was diagnosed with prostate cancer on July 31, 2006;

17

(b) By emails from plaintiff to the persons in plaintiff's organization who "needed to know" about plaintiff's illness for business reasons (Ray Richardson, David Ahl, Michael Morse, and Mary Weidman, the Human Resources person in charge of granting medical leave, etc.) dated August 23, 2006, plaintiff informed the above persons of his medical requirements regarding his prostate surgery (his pre-surgery tests in Manhattan and his surgery date in Manhattan, September 7, 2006) in order to let them know when he would be taking necessary "sick days" outside the office while he traveled to Memorial Sloan-Kettering Hospital in Manhattan for such tests and surgery for his prostate cancer;.

(c) By reply email to plaintiff dated August 23, 2006, knowing full well that plaintiff was scheduled for surgery to remove his cancerous prostate gland at Memorial Sloan-Kettering Hospital on September, 7, 2006, RR **intentionally and maliciously personally insulted plaintiff** by actionably stating/implying/insinuating that plaintiff was trying to publicly announce his prostate cancer to the world via the Empire State Development Press Officer (Mark Weinberg) whose job is to handle Press Announcements on behalf of Empire State Development; more specifically, by such 8/23 reply email, RR specifically wrote to plaintiff: "**WHY ARE YU SHARING ALL THIS PERSONAL DETAIL WITH MARK W? I WOULD THINK YU WOULD WANT TO KEEP IT DISCREET SHARED ONLY ON A NEED TO KNOW BASIS? RAY RICHARDSON.**". By return email to RR dated 8/23, plaintiff told RR that plaintiff was not "sharing" this "personal detail" with Press Officer Mark Weinberg. Because RR had copied David Ahl on this disgusting/insulting email, plaintiff thereafter emailed David Ahl, explaining to him that "Ray is just mistaken". Indeed, by circulating this defamatory

email to David Ahl, RR also committed an actionable, intentional, and malicious defamation against plaintiff.

31. Thereafter, on 8/23, plaintiff complained to David Ahl, plaintiff's Boss, about the above intentional and malicious insult, told David Ahl that RR had gone way over the line, and had better apologize to plaintiff immediately. According to David Ahl's subsequent statements to plaintiff, David did in fact pass along to RR plaintiff's demand for an apology.

32. However, RR never so apologized to plaintiff, nor even admitted to plaintiff that RR had made a mistake.

33. **This was the straw that broke the camel's back.**

34. The above wrongdoing is and was egregious in the extreme, and shocks the conscience. By such wrongdoing, RR violated his sacred public trust, and, thereby, acted and operated in his personal, individual, and private capacity as an individual wrongdoer. The wrongdoing set forth above is egregious, unreasonable, personal wrongdoing which is outside of the scope of the public duties/powers of the named defendant, RR. As plaintiff went to work every day, during and after such above-described attacks, if he learned that RR was coming into the office that day, his blood pressure and stress levels shot up; if he heard that RR was not coming into the office that day, his blood pressure and stress levels returned to normal, and plaintiff could enjoy a normal, productive work-day.

35. The next day, August 24, 2006, **as required by plaintiff's principles of personal integrity, honor and self-respect,** plaintiff formally put a written workplace grievance   . and complaint against RR on the record by email dated June 24, 2006 to David Ahl,

plaintiff's Boss, and the only person that plaintiff trusted at the senior management level

of the Albany ESD Office. A copy of that email is annexed hereto in Exhibit 2. It reads,

in part, as follows in paragraph 11 thereof:

> "11. The main thing is that Ray Richardson is intentionally and maliciously
> putting me in a constant mental state of fear of being purportedly fired by him at
> his sadistic whim without any just cause or just reason. This is
> a terrifying ordeal to have to endure on a daily basis – especially since I am
> now diagnosed with prostate cancer, have scheduled surgery for
> September 7, and **cannot afford to have my health insurance jeopardized
> by a purported wrongful firing by Ray Richardson at this time on his
> sadistic and malicious whim.** He has no right to fire me, he has no just
> cause to fire me, and I will not be played with like a mouse by a grinning,
> sadistic cat."

## SUBSTANTIVE ACTIONABLE FACTS AND/OR ALLEGATIONS – PART II

### B: TORT WRONGDOING BY DEFENDANTS RR,
### BACHELLER, LACIVITA, AND REGAN IN THEIR
### INDIVIDUAL AND PERSONAL CAPACITIES

### VIOLATIONS OF THE PUBLIC TRUST;
### PUBLIC OFFICAL CORFRUPTION;
### CRIMINAL ACTIVITY VIOLATIONS;
### FIRST AMENDMENT SPEECH VIOLATIONS;
### DUE PROCESS PROPERTY VIOLATIONS, ETC.

36. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1

through 35 above, as is set forth at length herein.

### C: THE CONSPIRACY

37. On and/or after August 24, 2006, defendants RR, LaCivita, Regan, and Bacheller,

reached a "meeting of the minds" and agreement to enter into a wrongful, unlawful,

illegal, tortious, and criminal conspiracy against plaintiff to accomplish a common

wrongful, unlawful, illegal, tortious, and criminal objective and common plan, the

purpose of which was three-fold: (a) to protect RR at all costs from being held to account

and/or sued by plaintiff for RR's above abusive workplace treatment of plaintiff and to

persecute plaintiff, and to intimidate/extort plaintiff, by instilling in plaintiff the

economic fear of being wrongfully discharged/fired without just cause in retaliation, if

plaintiff refused to execute the Extortion Document set forth and described below which

defendants wrongfully demanded that plaintiff sign upon penalty of being fired if plaintiff

refused to do so, which Extortion Document was intended to protect RR and the other

defendants from their wrongdoing; (b) to wrongfully discharge/fire plaintiff without just

cause in retaliation if plaintiff refused to sign the subject Extortion Document pursuant to

defendants' demands, which wrongful discharge/firing defendants actually perpetrated as

an overt act pursuant to their criminal conspiracy in order to punish plaintiff for refusing

to sign the Extortion Document and in an attempt to financially cripple plaintiff so that

plaintiff would not have the financial wherewithal to bring suit against defendants in

federal court for their criminal wrongdoing after plaintiff refused to sign the Extortion

Document; and (c) to obstruct justice by using intimidation against plaintiff, and/or by

threatening plaintiff, and/or by corruptly persuading plaintiff, and/or by attempting to do

so, and/or by conspiring to do so, and/or by engaging in misleading conduct toward

plaintiff, with intent to: (1) influence, delay or prevent the testimony of plaintiff in an

official federal proceeding; and/or (2) hinder, delay, or prevent the communication to a

federal law enforcement officer or judge of the United States of information relating to

the commission or possible commission of a Federal offence -- all by threatening to fire

plaintiff if he refused to sign the Extortion Document and by actually firing plaintiff

when plaintiff made clear that he would not sign the Extortion Document. Indeed,

pursuant to their extortion scheme, defendants wrongfully fired plaintiff without just

cause in retaliation for plaintiff's refusal to sign the Extortion Document pursuant to

defendants' demands, which wrongful discharge/firing defendants perpetrated as an overt

act pursuant to their criminal conspiracy in order to punish plaintiff for refusing to sign

the Extortion Document and in an attempt to financially cripple plaintiff so that plaintiff

would not have the financial wherewithal to bring suit against defendants in federal court

for their criminal wrongdoing after plaintiff refused to sign the Extortion Document.

### D: ACTS IN FURTHERANCE OF THE CONSPIRACY

38. Pursuant to the above agreement and conspiracy, defendants committed many overt

acts in furtherance of their conspiracy as more fully set forth below, and plaintiff was

directly and proximately injured thereby as is set forth more fully below. Such injuries

include, without limitation, plaintiff's loss of his professional employment, health

benefits, professional reputation, professional status, and ability to find new gainful

employment in view of the fact that plaintiff was "fired".

39. On August 23, 2006, after receiving the above intentional, malicious insult from RR

(see paragraph 30 above), plaintiff called the General Counsel and Deputy Commissioner

of the Albany ESD Office, defendant Robert Regan, and complained to him about the

workplace abuse that RR was visiting upon plaintiff. Plaintiff asked Mr. Regan three (3)

questions: (1) are you an honorable man?; (2) do you have any guts?; and (3) do you

believe in the attorney-client privilege?. Defendant Regan responded "Yes" but acted

otherwise and committed a number of overt acts pursuant to and in furtherance of the

criminal conspiracy described herein (see, for example, paragraph 43 below). Plaintiff

told defendant Regan, on 8/23 by phone, that RR was maliciously raising plaintiff's

blood pressure and stress levels by his constant sadistic workplace abuse against plaintiff.

Plaintiff told defendant Regan that RR was guilty, at minimum, of actionable intentional, malicious, and sadistic infliction of emotional/mental/physical distress and abuse against plaintiff in the workplace. Plaintiff also told defendant Regan about RR's constant threats to wrongfully discharge/fire plaintiff for no just cause or justifiable reason. Plaintiff asked defendant Regan to have lunch with him, outside the office, to discuss the foregoing, to discuss the bringing of workplace grievances against RR, and to discuss the best way to handle the situation. Defendant Regan, as ESD General Counsel, was a proper person for plaintiff to approach for legal advice regarding plaintiff's rights against RR and regarding proper grievance procedures to be instituted against RR. Defendant Regan promised to call plaintiff back to arrange the discussed lunch, but defendant Regain never did call plaintiff back about the foregoing, and never arranged to meet plaintiff for lunch as discussed, nor to discuss and/or explain to plaintiff the proper method for bringing a workplace grievance against RR. Defendant Regan's above failure to advise plaintiff and give plaintiff the requested legal advice establish that Regan had joined the criminal conspiracy against plaintiff and was acting in furtherance thereof and pursuant thereto by, inter alia, refusing to give plaintiff proper legal advice about his workplace grievance against RR, and by fraudulently concealing material facts from plaintiff about proper grievance procedures that would have protected plaintiff's job.

40. On August 24, 2006, although plaintiff put his formal Workplace Grievance and Complaint on the record by email to his Boss, David Ahl, at 8:32 AM in the morning of 8/24, David Ahl neither called nor spoke with plaintiff about said Formal Email Complaint the entire day.

41. Thereafter, David Ahl, plaintiff's Boss, did approach plaintiff, indicating that the "powers that be" had decided that plaintiff would be moved down to a 2nd Floor office away from RR, would be re-assigned from the Strategic Business Division to a separate division under the exclusive control of David Ahl, and would be able to continue to work on the major Projects that plaintiff was then working on. However, David Ahl told plaintiff that such re-assignment would be contingent upon the negotiation and signing of an Agreement pursuant to which the matter would be put in the past for everyone, so that everyone, including RR, and including plaintiff, would be protected from any possible future consequences, lawsuits, claims, grievances, disputes, etc.

42. **In point of fact, there was nothing to legitimately and/or properly and/or legally "negotiate". Plaintiff had put on the record a legitimate workplace grievance and actionable lawsuit against RR, which plaintiff was entitled to pursue without the extortionate threats of being wrongfully discharged/fired in retaliation against plaintiff for exercising his above constitutionally-protected rights to assert a workplace grievance and/or to commence actionable litigation againt RR.**

### E: THE SEPTEMBER 5, 2006 EXTORTION ATTEMPT

43. Thereafter, on September 5, 2006, plaintiff's last day at work before his September 7, prostate cancer surgery at Memorial Sloan-Kettering Hospital in Manhattan (plaintiff was leaving for Manhattan on September 6), the following disgusting, orchestrated events occurred, intended to intimidate plaintiff into executing and signing the "one-sided" Document (hereinafter referred to as the "Extortion Document"), a copy of which is annexed hereto in Exhibit 3. Defendant co-conspirators, RR, Joseph LaCivita, Robert Regan, and John Bacheller, pursuant to and in furtherance of their criminal conspiracy,

24

took the following overt actions in furtherance of their criminal conspiracy on September 5, 2006, to wit: Said co-conspirators conspired to and attempted to extort and intimidate plaintiff into executing and signing the Extortion Document by means of their following wrongful overt acts undertaken pursuant to their conspiracy to extort and intimidate plaintiff, and to put plaintiff in a state of fear (which they accomplished) of being wrongfully discharged/fired solely on a retaliatory basis if plaintiff refused to accede to defendant conspirators' demands that plaintiff sign such Extortion Document on September 5, 2005, the day before he was leaving for Manhattan for his prostate cancer surgery at Memorial Sloan-Kettering Hospital in Manhattan. The Extortion Document set forth in Exhibit 3 hereto is a document nobody in his right mind would ever sign: (a) it calls for plaintiff to totally recant, retract, and repudiate his workplace grievance claims against RR as if they were false; and (b) it requires plaintiff to give everyone in NYS Government a General Release, while giving no release or protection whatsoever to plaintiff:

(a) **With no advance notice whatsoever,** pursuant to and in furtherance of their subject criminal conspiracy and at the directions and instructions of, among others, defendant RR and defendant LaCivita, somebody came into plaintiff's office on the 7th Floor at about 11:30 AM and demanded that plaintiff shut down his computer, which plaintiff was told, must be moved to the 2nd Floor immediately, and plaintiff was compelled to accede to this demand (plaintiff was unable to "start the computer up" when he visited the 2nd Floor on 9/5 because plaintiff did not know how to navigate through the new identity set-up procedure on the initial page of the computer);

(b) **With no advance notice whatsoever,** pursuant to and in furtherance of their subject criminal conspiracy and at the directions and instructions of, among others, defendant RR and defendant LaCivita, between 12:30 and 12:45 PM, plaintiff's telephone in his 7th Floor office was shut off. This really alarmed plaintiff because he was expecting calls from various doctors in connection with his travel to Manhattan for surgery on September 7, 2006, they all had his private line (not the general number), and so they could not get through to him;

(c) As plaintiff was getting ready to leave and go home to get some rest in anticipation of his September 7 surgery because both his computer and his phone had been shut off, at about 1:30 to 2 PM, plaintiff ran into defendant Joseph LaCivita in the hallway. Apparently, as plaintiff later learned when he gained access to his computer after he came back from surgery, defendant LaCivita had sent plaintiff an email dated September 5 at 1:23 PM in which defendant LaCivita had said: "Hey, Howard. I would like to talk with you before you go". Pursuant to and in furtherance of the subject criminal conspiracy, and as an overt act in the furtherance thereof, defendant LaCivita asked plaintiff to come with defendant into defendant's office, which plaintiff did. Defendant LaCivita then shoved the Extortion Document in plaintiff's face for the first time, and demanded that plaintiff sign it immediately before plaintiff left for the day, stating "Howard, We have thought about it and we want you to sign this before you leave today". Plaintiff responded, as politely as possible, that, normally, in such situations, general releases are exchanged in order to protect everybody and that plaintiff wanted to show the document to his attorney for approval. In response to plaintiff, defendant LaCivita, repeated to plaintiff that plaintiff had better sign the Extortion Document before

he left for the day, stating "Howard, this is for your own good or you will face the consequences". In fear of and afraid of being fired for purported insubordination on the day before he was leaving for his September 7 prostate cancer surgery, and in fear of being fired in that such firing might affect his health insurance and possibly make it financially impossible for plaintiff to have his scheduled surgery and/or make it financially impossible for plaintiff to get the necessary post-operative treatment for his prostate cancer, plaintiff told defendant LaCivita that plaintiff was exhausted, full of anxiety about his surgery, that his blood pressure was rising to dangerous levels, and that plaintiff could not possibly focus on a legal document now (in fact, plaintiff refused to even look at the document being shoved in his face by LaCivita). Defendant LaCivita did not relent. He then demanded that plaintiff speak on the phone with ESD General Counsel, defendant Robert Regan. Plaintiff, at LaCivita's demand, did speak with defendant Regan on the phone. Defendant Regan, pursuant to and in furtherance of the subject criminal conspiracy, and as an overt act in the furtherance thereof, also demanded that plaintiff sign the Extortion Document immediately before he left for the day, stating to plaintiff: "Howard, We have decided on this document. If you don't sign it today, there will be real trouble for you at ESD". Plaintiff responded by telling defendant Regan the same thing he had told LaCivita – that he was too exhausted, tired, full of anxiety, upset, etc. to look at a legal document in plaintiff's current condition. Plaintiff told both LaCivita and Regan that he was meeting with his attorney later that day (9/5) to get his Will signed, and that he would give the Extortion Document to his attorney later that day, and that his attorney would get back to defendant Regan. Since plaintiff would not accede to LaCivita's and Regan's threats and extortions, despite plaintiff being put in great fear

and anxiety that he might be immediately wrongfully discharged/fired, on a retaliatory

basis, if he refused to sign the Extortion Document as demanded by LaCivita and Regan

on September 5, 2006, LaCivita and Regan relented and let plaintiff go home. Because

plaintiff was still in fear that he might be fired later in the day of September 5, he sent to

David Ahl, LaCivita, and Regan an "appeasing" email from his home computer later in

the day (9/5). By reply email from David Ahl in response to plaintiff's above

"appeasement" email, David Ahl said: **"Hi howie, sorry this happened today and sorry**

**I have not been reachable. One of my closest friends lost his mother this weekend**

**and I was out of town at her funeral. We will get all of the details ironed out before**

**you return. I will take care of dairyland and read all of your other emails tomorrow.**

**Get plenty of rest today and tomorrow and don't think at all about esd. Best of luck,**

**talk to you soon. Dave."**

44. **From September 5, 2006 until plaintiff was wrongfully purportedly**

**fired/discharged effective October 11, 2006, defendants never altered their**

**extortionate scheme and conspiracy to extort/compel plaintiff to execute and sign**

**the Extortion Document. They never changed their position one iota. When it**

**became apparent to defendants that plaintiff would not accede to their extortionate**

**demands, they wrongfully fired/discharge plaintiff solely in retaliation for his**

**refusal to execute and sign the Extortion Document and in retaliation against**

**plaintiff's constitutionally-protected protests about the manner in which he was**

**being corruptly treated by defendants in connection with their extortion scheme to**

**compel plaintiff to sign the Extortion Document and thereby "silence" plaintiff.**

### F: THE EXTORTION CONSPIRACY CONTINUED UPON PLAINTIFF'S RETURN TO WORK FROM HIS SURGERY

28

45. Plaintiff had his prostate surgery to remove his cancerous prostate gland at Memorial Sloan-Kettering Hospital in Manhattan on September 7, 2006, and returned to his home in Troy, NY on September 13, 2006. By email from home dated September 15, 3006, plaintiff informed his Boss, David Ahl, of his status, and told David Ahl that plaintiff had a call into his attorney about the document which defendant LaCivita had given to plaintiff on 9/5, which plaintiff had not yet looked at, or talked to his attorney about. Plaintiff stated in this email that: "I am willing to sign anything that is reasonable and will put this incident permanently in the past for all concerned."

## G: MORE EXTORTION THREATS/ULTIMATUMS

46. **Thereafter, plaintiff spoke with his attorney. Plaintiff's attorney told plaintiff that, on or about September 13, 2006, plaintiff's attorney spoke with defendant ESD General Counsel Robert Regan, and that defendant Regan, pursuant to and in furtherance of the subject criminal conspiracy, and as an overt act in the furtherance thereof, had told plaintiff's attorney to convey to plaintiff the ultimatum/threat that plaintiff would be fired unless plaintiff agreed to execute and sign the Extortion Document (set forth in Exhibit 3 hereto), which defendant LaCivita had shoved in plaintiff's face on September 5, 2006, just two days before plaintiff's September 7 surgery.**

47. **The above continuing ultimatum made plaintiff extremely angry and put plaintiff in a great fear of the loss of his job, his health insurance, etc.**

48. David Ahl and defendant LaCivita called plaintiff at home on September 21, 2006, and it was agreed that plaintiff would return to work on September 26, 2006. Plaintiff's

email from home to David Ahl and defendant LaCivita dated  September 22, 2006

confirms the foregoing, and confirms that plaintiff explained to David Ahl and defendant

LaCivita the staus of plaintiff's medical condition and the fact that it would take some

time for plaintiff to regain urinary control/continence. The issue of the 9/5 Extortion

Document was not raised in the conversation.

49. Thereafter, plaintiff returned to work on September 26, 2006, and did his usual

professional job in discharging his work responsibilities until the day he was fired.

50. However, the threats and extortion that plaintiff would be fired in retaliation unless he

signed the Extortion Document continued when plaintiff returned to work.

51. Accordingly, plaintiff became angrier and angrier, but continued to perform his

professional job in an excellent manner, despite being placed in a state of great and

constant fear that he would be fired solely in retaliation unless he complied with

defendants' extortionate demands to sign the Extortion Document. The above

extortionate conspiracy continued unabated, and plaintiff got sick and tired of it.

52. But plaintiff persevered in continuing to do his job on a professional basis, trying to

heal from his surgery, and trying to protect his job, while constantly being put under the

terror and fear of being wrongfully discharged/fired at any time solely in retaliation for

his refusal to sign the Extortion Document, as set forth more fully herein..

53. By emails from plaintiff to David Ahl, defendant Regan, and defendant LaCivita

dated September 27 and 28, plaintiff told them that plaintiff and his attorney were

working on a mutually agreeable written resolution of the matter at hand. **However,**

**plaintiff received absolutely no substantive response to these overtures – and, in**

fact, there was nothing lawful or legitimate to "negotiate" as set forth more fully in paragraph 42 above.

54. By email dated Friday, September 29 at 11:01 AM, from plaintiff to David Ahl, defendant Regan, and defendant LaCivita, plaintiff actually provided a draft form of settlement agreement to them. **However, again, plaintiff received absolutely no substantive response to this overture -- and, in fact, there was nothing lawful or legitimate to "negotiate" as set forth more fully in paragraph 42 above.**

55. **By this time, it was transparently clear and apparent to plaintiff that defendants were still engaged in their conspiracy to extort/compel plaintiff to sign the Extortion Document by their ongoing threats to retaliate by wrongfully discharging/firing plaintiff in retaliation if he refused to accede to their demands.**

56. Accordingly, by email dated Saturday, September 30, 2006, knowing that defendants were acting in bad faith and had no intention of engaging in fair and just settlement negotiations, **or any negotiations at all,** plaintiff sent David Ahl, defendant Regan, and defendant LaCivita an email sending them a second draft proposed Settlement Agreement, **but plaintiff, finally sick and tired of defendants' extortion conspiracy, and finally physically and emotionally and psychologically exhausted by defendants' conspiracy tactics and running out of patience, told defendants what he really thought of them, while, at the same time, offering to settle with them on a fair and legitimate basis.** In such September 30 email, after his surgery, and after being angered, frustrated, and physically, mentally, and emotionally exhausted by the disgusting post-surgery behavior directed at plaintiff by his defendant superiors, as set forth more fully herein, plaintiff stated, inter alia, in paragraph 4 thereof, as follows:

31

"4. For the record, I really do not appreciate the manner in which I was treated on September 5, two days before my surgery, by this Office (which treatment I have previously made a record of by email to you previously and will not repeat here). It was shoddy, unprofessional, and insulting, and, the way I see it, and the way I think a jury would see it, it constituted a clear and intentional attempt to intimidate me, two days before my surgery, into signing this absurd document that Joe gave me on 9/5 just before I left for the day on 9/5 in order to rest for my surgery. This document was an absurdity. Nobody is his right mind would sign it. It was, in effect, a suicide note/death warrant that would have subjected me to much undeserved potential liability. Everything I have said about Ray Richardson is absolutely, 100%, true, and I have no intention to "repudiate" any of my own statements ….. I don't think it would take a jury long to "get" this – it is so obvious – and I do retain a copy of this absurd document which Joe put in my face on 9/5 ……".

57. Likewise, by emails dated Sunday, October 1, 2006, and Monday, October 2, 2006, plaintiff put David Ahl, defendant Regan, defendant LaCivita, **and defendant John Bacheller,** on notice that defendants would be sued by plaintiff if plaintiff were fired.

58. Pursuant to and in furtherance of the subject criminal conspiracy, and as an overt act in the furtherance thereof, defendant Bacheller, the Chief and Head of the Albany ESD Office, completely ignored plaintiffs' email appeals to intervene and stop the subject criminal conspiracy, thereby establishing that he was nothing more than a "stooge" of defendant Ray Richardson, the conspiracy "Ringleader".

### H. PLAINTIFF'S LAST PROTEST

59. Finally, by email dated Tuesday, October 2, 2006, plaintiff, **in further constitutionally-protected 1st Amendment protest at defendants' public corruption,** further emphasized to defendants that he would no longer tolerate their extortionate scheme/conspiracy. In such email, which was emailed to David Ahl, and to defendants Regan, LaCivita, and Bacheller, plaintiff stated, inter alia, as follows:

….. "2. **Bob Regan, the ESD General Counsel, told my attorney, in**

**no uncertain terms, that if I did not sign that [Extortion Document]
shoved in my face by Joe LaCivita on 9/5, as I was leaving to rest
for my surgery on 9/7, then, in such event, I would be fired by
ESD. That is what Bob Regan said to my attorney.**

3. **I am not going to sign that [Extortion Document], so make up your
minds ....".**

60. By subsequent email dated October 2, 2006, in response to plaintiff's above October

2, 2006 email, defendant LaCivita purported to put plaintiff on "Paid Administrative

Leave" commencing Tuesday, October 3.

61. Pursuant to the above wrongful and criminal conspiracy, plaintiff was wrongfully

purportedly fired/discharged effective October 11, 2006 with absolutely no reason or

cause given therefor. The purpose of the wrongful discharge/firing, inter alia, was to

continue the conspiracy to protect RR at all costs and to persecute plaintiff, punish

plaintiff, and fire plaintiff so that plaintiff would suffer economic injury and injury to his

property, economic status, and reputation such that plaintiff would find it impossible to

retaliate against defendants for their wrongdoing against him insofar as, defendants

believed, plaintiff would, by reason of such wrongful firing, lack the economic

wherewithal to bring suit against defendants in federal court and to disclose defendants'

criminal wrongdoing to the appropriate federal law enforcement authorities. Such

wrongful and criminal conspiracy and firing "backfired" on defendants by reason of this

lawsuit.

62. **For the entire period from September 5, 2006 when defendants shoved the**

**Extortion Document in plaintiff's face until his wrongful purported discharge/firing**

**on October 11, 2006, DEFENDANTS NEVER NEGOTIATED IN GOOD FAITH**

**WITH PLAINTIFF – DEFENDANTS JUST PURSUED THEIR EXTORTIONATE**

CONSPIRACY TO EXTORT/COMPEL PLAINTIFF, BY FEAR OF A
WRONGFUL DISCHARGE/RETALIATION FIRING, TO SIGN THE
EXTORTION DOCUMENT SET FORTH AS EXHIBIT 3 HERETO. INDEED,
DEFENDANT REGAIN, IN AN OVERT ACT PURSUANT TO THIS CRIMINAL
EXTORTIONATE CONSPIRACY, AGAIN EXTORTED/THREATENED
PLAINTIFF, ON OR ABOUT SEPTEMBER 13, 2006, IN FURTHERANCE OF
THE CONSPIRACY, BY TELLING PLAINTIFF'S ATTORNEY TO DELIVER
THE MESSAGE TO PLAINTIFF THAT PLAINTIFF WOULD BE FIRED
UNLESS HE SIGNED THE EXTORTION DOCUMENT. ULTIMATELY, WHEN
DEFENDANTS REALIZED THAT PLAINTIFF WOULD NOT SUCCUMB TO
THEIR EXTORTIONATE DEMANDS THAT PLAINTIFF EXECUTE AND SIGN
THE EXTORTION DOCUMENT, AND WOULD NOT BE "SILENCED", THEY
WRONGFULLY DISCHARGED/FIRED PLAINTIFF EFFECTIVE OCTOBER
11, 2006 SOLELY IN RETALIATION FOR HIS REFUSAL TO EXECUTE AND
SIGN THE EXTORTION DOCUMENT AND FOR HIS REFUSAL TO FOREGO
HIS 1ST AMENDMENT RIGHTS TO PROTEST DEFENDANTS'
EXTORTIONATE SCHEME AND CONSPIRACY AGAINST PLAINTIFF.

## I: PUBLIC CONCERN AND PROTEST

63. The above corrupt conduct of high-ranking NYS Economic Development
Organization public officials aimed at a low-level public employee is plainly a matter of
public concern, and plaintiff is entitled to speak out, express himself, protest, and object
to such behavior, pursuant to his 1st Amendment constitutionally-protected rights, and as
an outraged public citizen objecting to the above criminal conspiracy being conducted by

such high-ranking public officials. Indeed, both (a) plaintiff's "speech" regarding

defendant RR's workplace abuse against plaintiff set forth in plaintiff's August 24, 2006

email to his Boss, David Ahl (annexed hereto in Exhibit 2 above), and (b) plaintiff's

subsequent "speech" set forth in (i) verbal statements that plaintiff made to David Ahl

and/or the individual defendants, and in (ii) other emails that plaintiff emailed to David

Ahl and to defendants, prior to his wrongful discharge/firing, pursuant to which plaintiff

expressed his protests and public concerns about the criminal conspiracy being

perpetrated against plaintiff, constitute constitutionally-protected "speech" by plaintiff,

which "speech", together with plaintiff's related refusal to sign the Extortion Document

described above, was the proximate and direct reason and cause that defendants fired

plaintiff in retaliation against plaintiff for refusing to sign the Extortion Document

pursuant to which defendants attempted to squelch such "speech". Indeed, when

defendants finally realized that plaintiff would not sign the Extortion Document, they

retaliated against plaintiff and punished plaintiff by firing plaintiff in retaliation against

plaintiff for plaintiff's exercise of his above constitutionally-protected "speech" as an

overt act in furtherance of their criminal conspiracy. Indeed, the Community/Voting

Electorate should be, and is, very concerned about such NYS government corruption at

high levels. Indeed, prior to being wrongfully discharged/fired, plaintiff spoke with his

Boss, David Ahl, and complained to David Ahl, who relayed such statements to

defendants, that the criminal conspiracy in which defendants were engaged against

plaintiff was clearly of public concern and interest in view of the fact that it represented

public corruption at the highest levels of the NYS Economic Development Organization

in Albany and plaintiff told David Ahl, plaintiff's Boss, who relayed such statements to

defendants, that plaintiff would bring a civil criminal conspiracy suit under RICO in

federal court against defendants if plaintiff were to be fired in retaliation for refusing to

sign the Extortion Document and that plaintiff would do so not only on plaintiff's own

behalf, but also for the public benefit in that the NYS Ecomonic Development

Organization in Albany was infected with public corruption and in that defendants were

violating their sacred public trust to the public by their criminal conspiracy against

plaintiff, a citizen of this State and a member of the public.

64. The "public official conspiracy" wrongdoing set forth above is egregious in the

extreme, shocks the conscience, and raises the level of wrongdoing from a private matter

to a matter of public concern, importance and significance to the community and to the

voting electorate of NYS, which must be dealt with by the most powerful criminal

enforcement tools (ie., RICO).

65. The underlying purpose of the "public official" conspiracy, more fully described

above, was to protect RR at all costs and to persecute plaintiff by conspiring and

attempting to extort/compel plaintiff, by means of instilling in plaintiff the fear of being

wrongfully fired/discharged without cause in retaliation against plaintiff if plaintiff

refused to accede to defendant co-conspirators' demands that plaintiff execute and sign

the Extortion Document described in paragraph 43 above. The co-conspirators who

intentionally joined in this conspiracy, with the full knowledge thereof and with the

requisite criminal intent and <u>mens</u> <u>rea</u>, and intentionally committed overt acts in the

furtherance thereof, with the full knowledge thereof and with the requisite criminal intent

and <u>mens</u> <u>rea</u>, include, among others, Ray Richardson (the "self-styled Public Sector

Ring-Leader" of the conspiracy), John Bacheller, Joseph LaCivita, and Robert Regan,

and other co-conspirators to be  named and included as defendants herein following

depositions and discovery.

66. The facts set forth above constitute public corruption and wrongdoing at the senior

management level of the NYS Economic Development Organizaion, and at the senior

level of State Government in the State of New York. It is public wrongdoing by high-

ranking public officials in violation of their sacred public trust, in which such named

individuals, in concert and conspiracy with RR, their "self-styled Public Sector Ring-

Leader", violated their public trust and, thereby, acted and operated in their personal,

individual, and private capacities as a "criminal gang" and/or "corrupt organization",

thereby successfully infiltrating a legitimate public entity, the NYS Economic

Development Organization (as described in paragraph 12 above), via their criminal

conspiracy and criminal racketeering schemes as more fully set forth above. See, eg.,

Atlas Pile Driving Co. v. DiCon, 886 F. 2nd 986, 990 (8th Cir. 1989): "The major purpose

behind RICO is to curb the infiltration of legitimate business organizations [such as the

NYS Economic Development Organization] by racketeers [such as RR and criminal

conspiracy gang, co-conspirators, henchmen, and stooges]". Accord: United v. Turkette,

452 U.S. 576, 591 (1981).

67. The wrongdoing set forth below is egregious, unreasonable, personal wrongdoing

which is outside of the scope of the public duties/powers of the named defendants.

68. **For high-ranking, senior NYS government public officials to "gang up" on a**

**low-ranking public employee such as plaintiff, in the manner and pursuant to the**

**criminal conspiracy set forth herein, which low-ranking public employee (plaintiff)**

**lacks any political power or political base in Albany, is a crime of public concern**

37

and importance, which must be punished with the full force of the criminal law.
This is a matter of general public concern and importance and must be dealt with
severely in order to ensure that such egregious behavior is put to an end, and not
repeated in the future.  This pattern of egregious public behavior, to be "flushed
out" during the course of discovery in this action, must be ended once and for all by
a punitive precedent which will finally deter such egregious behavior in the future in
order to protect the integrity of NYS Government and to protect the low-level
public employees that serve faithfully on behalf of the State of New York.

### PLAINTIFF'S INJURY AND EMOTIONAL DISTRESS

69. Plaintiff suffered great injury to his business, property, professional reputation, and
mental/emotional health, including, without limitation, the loss of his gainful
employment and professional position and reputation, by reason of this wrongful
discharge/firing as is more fully set forth above.

70. Defendant, and each of them, by reason of their above wrongful actions and
conspiracy, inflicted severe emotional distress and mental anguish upon plaintiff, to wit:

(a) the original campaign of sadistic and malicious infliction of mental distress by
defendant RR was egregious and outrageous, particularly since part of such mental abuse
was visited upon plaintiff at times when RR knew that plaintiff had been diagnosed with
prostate cancer and knew that plaintiff would be having major surgery to remove his
cancerous prostate gland on September 7, 2006;

(b) the subsequent extortion scheme and criminal conspiracy by defendants
against plaintiff in order to protect RR, persecute plaintiff, cover-up RR's wrongdoing,
and extort plaintiff to execute the Extortion Document was egregious and outrageous,

particularly since such mental abuse was visited upon plaintiff at times when defendants,
and each of them, knew that plaintiff had been diagnosed with prostate cancer and knew
that plaintiff would be having major surgery to remove his cancerous prostate gland on
September 7, 2006 (the September 5, 2006 orchestrated conspiratorial effort by
defendants to intimidate/extort plaintiff into signing the Extortion Document the day
before he was leaving for Manhattan for his prostate surgery at Memorial Sloan-Kettering
Hospital was particularly egregious and outrageous); and

(c) defendants' post-surgical behavior to plaintiff when plaintiff returned to his
home in Troy, NY and returned to work on September 26, 2006 was egregious and
outrageous in that, inter alia, at all such times, while plaintiff was doing his best to heal
from his surgery and was suffering the debilitating post-surgery consequences of such
surgery, defendants continued their conspiratorial extortion scheme and conspiracy
against plaintiff, refused to negotiate in good faith with plaintiff about a fair and just
manner in which to resolve the workplace abuse incidents on a fair and reasonable basis,
refused to bring RR to account for his sadistic and malicious workplace abuse against
plaintiff, and continued their intimidation/extortion scheme to intimidate plaintiff into
signing the Extortion Document while plaintiff was doing his best to heal and recover,
was doing his job on a professional basis, and, in addition, on a good faith basis, was
trying to reach a reasonable resolution of subject workplace abuse incidents by drafting
and delivering to defendants reasonable documents of resolution (the drafting of which
totally exhausted plaintiff given his post-sugical condition), which defendants totally
ignored and refused to address in any good faith manner in furtherance of their

continuing criminal conspiracy to extort/intimidate plaintiff into signing the Exortion

Document; and

(d) defendants' post-surgical behavior to defendant was egregious and outrageous

in that **they never intended to deal with plaintiff on a good faith basis and never**

**intended to consider in good faith any resolution of the subject workplace abuse**

**incidents on any basis other than extorting/intimidating plaintiff into signing the**

**Extortion Document**, but, in bad faith and with sadisitic and malicious intent, led

plaintiff on and pretended that they would consider, on a good faith basis, the draft

settlement documents that plaintiff was preparing and delivering to defendants, while, at

the same time, plaintiff was trying to heal from his surgery and doing his job on a

professional basis; this bad faith course of behavior by defendants caused plaintiff

extreme mental distress and mental and emotional and physical distress because it was

extremely difficult and exhausting for plaintiff, in his post-surgical state and with the

complications of his surgery, to do all three (3) things at once: (1) heal and recuperate

from his surgery; (2) do his job in a professional manner (which plaintiff did); and (3)

draft and prepare complicated legal documents, in good faith, in order to attempt to reach

a reasonable resolution of the subject workplace abuse incidents; indeed, this three-

pronged effort totally exhausted plaintiff and caused plaintiff to suffer severe emotional,

mental, and physical distress and mental anguish;

(e) defendants' post-surgical behavior in wrongfully discharging/firing plaintiff in

sole retaliation for his refusal to accede to their demands to sign the Extortion Document

was egregious and outrageous, particularly in view of the manner in which plaintiff was

fired (to be fleshed out in discovery) and defendant's refusal to give plaintiff any

legitimate reason or allegedly just cause for his firing; and

(f) defendants' wrongful discharge/firing of plaintiff  without just cause or reason

was egregious and outrageous in that defendants knew that plaintiff was having severe

financial problems and would have great difficulty in finding and new job in view of,

inter alia, the damage to his reputation caused by the wrongful discharge without just

cause. Again, this wrongful firing was an overt act in defendant's continuing criminal

conspiracy to protect RR at all costs and to persecute plaintiff – and to attempt to ensure

that plaintiff would lack the financial wherewithal to sue defendants for their egregious

and outrageous behavior by depriving plaintiff of his salaried income, health benefits, etc.

## CAUSES OF ACTION

## FIRST CLAIM AND CAUSE OF ACTION

### RACKETEER INFLUENCED AND
### CORRUPT ORGANIZATIONS ACT VIOLATIONS AND CRIMES

71. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1

through 70 above, as if set forth at length herein.

72. This Claim is asserted against defendants in their individual and personal capacities.

73. The enterprise referred to herein, pursuant to 18 U.S.C. 1961(4), is the NYS

Economic Development Organization as defined in paragraph 12 above (hereinafter

referred to in this RICO cause of action as "ESD").

74. Pursuant to 18 U.S.C. 1962 (c), defendants, and each of them, who were, and are, persons (within the meaning of 18 U.S.C. 1961(3) and 1962(c)) employed by and/or associated with ESD, an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, unlawfully conducted or participated, directly or indirectly, in the conduct of ESD's affairs through a pattern of racketeering activity, as such pattern of racketeering activity is defined in 18 U.S.C. 1961 (5) and is set forth hereinafter in paragraph 79-82 below.

75. In addition, pursuant to 18 U.S.C. 1962 (d), defendants, and each of them, who were, and are, employed by and/or associated with ESD, an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, unlawfully conspired, and/or attempted to conspire, to violate the provisions of 18 U.S.C. 1962 (c) by conducting or participating, or by attempting to conduct or participate, directly or indirectly, in the conduct of ESD's affairs through a pattern of racketeering activity, as such pattern of racketeering activity is defined in 18 U.S.C. 1961 (5) and is set forth hereinafter in paragraph 79-82 below.

76. This Honorable Court has jurisdiction, pursuant to 18 U.S.C. 1964 (a), to prevent the continuation of such RICO violations

77. Pursuant to 18 U.S.C 1964 (c), plaintiff herein, who has been injured in his business or property by reason of a violation of 18 U.S.C. 1962 (c) and/or (d), or both, which racketeering activities were the "but for", direct, and proximate cause of plaintiff's injuries in that, inter alia, plaintiff was wrongfully discharged/fired in retaliation solely because he refused to sign the Extortion Document and refused to be silenced by the terms thereof, is entitled to recover threefold damages, including threefold punitive

damages, he has sustained together with the cost of suit, including a reasonable attorney's fee. As a direct and proximate result of, and by reason of, the activities of defendants and their conduct in violation of 18 U.S.C. 1062(c), plaintiff has been injured in his business and property within the meaning of 18 U.S.C. 1964 (c). Plaintiff was so injured by reason of the fact that **plaintiff was the direct and intended victim and target of defendants' racketeering activities and of defendants' criminal Hobbs Act extortion conspiracy. The subject criminal Hobbs Act extortion conspiracy against plaintiff was the direct and proximate cause of injury to plaintiff's business or property. Indeed, defendants, pursuant to their criminal conspiracy, conspired and attempted to obtain from plaintiff the executed Extortion Document, thereby conspiring and attempting to deprive plaintiff of his valuable property rights and to obtain and arrogate those property rights to themselves for their own benefit.  Indeed, obtaining such valuable property rights from plaintiff was the primary purpose, target and goal of their criminal conspiracy. Realizing that plaintiff would not accede to defendants' extortionate demands to sign the Extortion Document, defendants, pursuant to their criminal conspiracy, in retaliation, caused plaintiff to be wrongfully discharged/fired, thereby causing great damage and injury to plaintiff's business or property, including, without limitation, the loss of his gainful employment, earnings, benefits, and reputation. Defendants' actions in intimidating and extorting plaintiff to sign the Extortion Document, and then in retaliating against and firing plaintiff for his refusal to do so constitute part of the racketeering activity complained of by plaintiff.**

78 Venue and process is proper in this Court pursuant to 18 U.S.C. 1965.

79. The "pattern of racketeering activity" defined in 18 U.S.C. 1961 (5) consists, inter alia, of the following acts, each of which, and all of which, constitute "racketeering activity" as defined in 19 U.S.C. 1961 (1):

(a) **EXTORTION:** By reason of the foregoing, defendants, and each of them, obstructed, delayed, or affected commerce or the movement of any article or commodity in commerce, by extortion, or attempted or conspired so to do, in that they attempted and/or conspired to obtain plaintiff's property from plaintiff, with his consent, induced by their wrongful use against plaintiff of plaintiff's fear of economic loss and/or harm (which fear they wrongfully and maliciously instilled in plaintiff by threats and/or other means, inter alia, and without limitation, that plaintiff would be wrongfully discharged/fired without just cause if he refused to sign the Extortion Document), or under the color of official right, all in violation of 18 U.S.C. 1951 and/or 18 U.S.C. 371 (in that defendants and each of them conspired against plaintiff to commit a violation of 18 U.S.C. 1951). It is clear that defendants have conspired and/or attempted to "obtain property" from plaintiff in that, inter alia, and without limitation, they have conspired and/or attempted to deprive plaintiff of his property rights by attempting to extort plaintiff into signing the Extortion Document pursuant to which defendants would have deprived plaintiff of his property rights and "obtained" those self-same property rights themselves, to wit: (a) plaintiff's property right in his legitimate workplace grievance against RR and defendants; (b) plaintiff's property right to bring a lawsuit against RR and defendants in federal court; (c) plaintiff's constitutionally-protected Article IV Privileges and Immunities Clause property rights, 1st Amendment property rights, 5th Amendment property rights, and 14th Amendment property rights of free speech to

44

protest defendants' corrupt conduct and gain access to the courts and to bring suit against

defendants; (d) plaintiff's property rights in his professional job and professional status;

and (e) plaintiff's property rights in his professional reputation and ability to find gainful

employment in the future. **Had defendants been successful in extorting plaintiff into**

**signing this Extortion Document, they would have taken from plaintiff, and**

**obtained for themselves, valuable property rights.** Indeed, the Extortion Document

itself constitutes an instrument pursuant to which defendants attempted to extort and

obtain valuable property rights from plaintiff. In addition, RR and defendants have

conspired and/or attempted to arrogate plaintiff's above property rights to themselves in

that, inter alia, and without limitation, RR and defendants would gain and/or obtain

"something of substantial value" from plaintiff were they to succeed in their

conspiratorial scheme, to wit: (a) they would obtain the valuable property rights not to be

sued by plaintiff; (b) they would obtain the valuable property rights not to be subjected to

public scrutiny and/or criminal investigation by silencing plaintiff; and (c) they would

obtain the valuable property rights to persecute and/or sue plaintiff to such an extent that

plaintiff could not financially afford to challenge them in court and/or in the public

forum. Indeed, pursuant to their extortion scheme, defendants wrongfully fired plaintiff

without just cause in retaliation for plaintiff's refusal to sign the Extortion Document

pursuant to defendants' demands, which wrongful discharge/firing defendants perpetrated

as an overt act pursuant to their criminal conspiracy in order to punish plaintiff for

refusing to sign the Extortion Document and in an attempt to financially cripple plaintiff

so that plaintiff would not have the financial wherewithal to bring suit against defendants

in federal court complaining of their criminal wrongdoing after plaintiff refused to sign

the Extortion Document. **Indeed, defendants, pursuant to their criminal conspiracy, conspired and attempted to obtain from plaintiff the executed Extortion Document itself. Had they been successful in extorting plaintiff into signing this Extortion Document, they would have taken from plaintiff, and obtained for themselves, valuable property rights. Indeed, obtaining such valuable property rights from plaintiff was the primary purpose, target and goal of their criminal conspiracy. Realizing that plaintiff would not accede to defendants' extortionate demands to sign the Extortion Document, defendants, pursuant to their criminal conspiracy, cause plaintiff to be wrongfully discharged/fired, thereby causing great damage and injury to plaintiff's business or property.**

(b) **OBSTRUCTION OF JUSTICE:** By reason of the foregoing, defendants, and each of them, knowingly used intimidation against plaintiff and/or threatened, or corruptly persuaded plaintiff, or attempted to do so, or conspired to do so, or engaged in misleading conduct toward plaintiff, with intent to: (1) influence, delay or prevent the testimony of plaintiff in an official proceeding; and/or (2) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offence, all in violation of 18 U.S.C 1512 and/or 18 U.S.C. 371 (in that defendants and each of them conspired against plaintiff to commit a violation of 18 U.S.C. 1512) --- all by threatening to fire plaintiff if he refused to sign the Extortion Document and by actually firing plaintiff when plaintiff made clear that he would not sign the Extortion Document. Indeed, pursuant to their extortion scheme, defendants wrongfully fired plaintiff without just cause in retaliation for plaintiff's refusal to sign the Extortion Document pursuant to

defendants' demands, which wrongful discharge/firing defendants perpetrated as an overt

act pursuant to their criminal conspiracy in order to punish plaintiff for refusing to sign

the Extortion Document and in an attempt to financially cripple plaintiff so that plaintiff

would not have the financial wherewithal to bring suit against defendants in federal court

for their criminal wrongdoing after plaintiff refused to sign the Extortion Document;

(c) **MAIL FRAUD:** Defendants and each of them, having devised or intending to

devise a scheme or artifice to defraud plaintiff for the purposes of (1) depriving plaintiff

of money or property and/or obtaining money or property from plaintiff, and/or (2)

depriving plaintiff of the intangible right of honest services – all by means of false or

fraudulent pretenses, representations, or promises, on October 11, 2006, caused to be

placed in a post office or authorized depository for mail matter, for the purpose of

delivery to plaintiff by the Postal Service, a letter dated October 11, 2005 from defendant

Joseph LaCivita, Deputy Commissioner/Administration of the NYS Department of

Economic Development/Empire State Development in which defendant LaCivita notified

plaintiff, pursuant to and in furtherance of defendants' criminal conspiracy and/or scheme

or artifice to defraud plaintiff and/or for the purpose of executing defendants' conspiracy

and/or scheme or artifice to defraud plaintiff or attempting so to do, that plaintiff had

been purportedly fired, all in violation of 18 U.S.C. 1341 and/or 18 U.S.C. 1346, which

defines a "scheme or artifice to defraud" under 18 U.S.C. 1341 to "include a scheme or

artifice to deprive another [plaintiff] of the intangible right of honest services." Such

"scheme or artifice to defraud" is violative of 18 U.S.C. 1341 and/or 18 U.S.C. 1346,

and/or 18 U.S.C. 371 (in that defendants and each of them conspired against plaintiff to

commit a violation of 18 U.S.C. 1341 and/or 1346), inter alia, in that, in furtherance of

their perpetration against plaintiff of the above-described wrongful and/or criminal

conspiracy against plaintiff, and/or scheme or artifice to defraud plaintiff, defendants and

each of them:

(1) as respects the scheme or artifice to defraud plaintiff by depriving

plaintiff of money or property and/or obtaining money or property from plaintiff: (a)

defendants and each them defrauded plaintiff by wronging plaintiff in his monetary

and/or property rights by dishonest methods or schemes involving depriving plaintiff of

his monetary and/or property rights by trick, deceit, chicanery, over-reaching or other

wrongdoing, including the fact that defendants, and each of them, fraudulently concealed

material facts from plaintiff regarding his workplace grievance substantive and/or

procedural rights pursuant to which plaintiff would have been able to have retained his

job, fraudulently concealed their secret material conflicts of interests/personal interests

from their public employer, the NYS Economic Development Organization (as defined in

paragraph 12 above), and from the State, and fraudulently concealed from plaintiff's

employer, the NYS Economic Development Organization (as defined in paragraph 12

above), and from the State, materials facts that defendants had no right to fire plaintiff

and did so only pursuant to their wrongful and/or criminal conspiracy and/or their

"scheme or artifice to defraud plaintiff" set forth herein, thereby, in addition, breaching

their fiduciary duties, as public officials, to plaintiff, their public employee, and to their

public employer and to the State;

2. as respects the scheme or artifice to defraud plaintiff by depriving

plaintiff of the intangible right of honest services: (a) defendants and each of them

defrauded plaintiff by depriving plaintiff of his intangible right of honest services by

dishonest methods or schemes involving depriving plaintiff of his intangible right to of honest services by trick, deceit, chicanery, over-reaching or other wrongdoing, including the fact that defendants, and each of them, fraudulently concealed material facts from plaintiff regarding his workplace grievance substantive and/or procedural rights pursuant to which plaintiff would have been able to have retained his job, fraudulently concealed their secret material conflicts of interests/personal interests from their public employer, the NYS Economic Development Organization (as defined in paragraph 12 above), and from the State, and fraudulently concealed from plaintiff's employer, the NYS Economic Development Organization (as defined in paragraph 12 above), and from the State, materials facts that defendants had no right to fire plaintiff and did so only pursuant to their wrongful and/or criminal conspiracy and/or their "scheme or artifice to defraud plaintiff" set forth herein, thereby, in addition, breaching their fiduciary duties, as public officials, to plaintiff, their public employee, and to their public employer and to the State. Plaintiff is a citizen of this State and is entitled to have the public officers of this State (ie., defendants herein) treat him in a fair and honest manner and not devise a "scheme or artifice to defraud" plaintiff by depriving plaintiff of his intangible right of honest public services from his public superiors (defendants) in his public organization, which right was violated by defendants in that defendants, as public servants, in violation of their fiduciary duties to the State, to the public, and to their lower-level public employees, violated plaintiff's above right as a public citizen and public employee entitled to be treated fairly and honestly by his public official superiors – and not be the victim of public corruption;

(3) as respects both of the "schemes or artifices to defraud" set forth above in sub-sections (1) and (2): (a) defendants and each of them engaged and participated in a scheme to defraud plaintiff; (b) defendants acted, pursuant to such scheme, with specific fraudulent intent to harm and defraud plaintiff by depriving plaintiff of money and/or property, and by depriving plaintiff of the intangible right of honest services, and defendants did so for their own corrupt benefit and/or financial gain, to harm plaintiff, and to prevent plaintiff from disclosing defendants' wrongdoing and bringing suit against defendants; (c) it was reasonably foreseeable to the defendants and each of them that the scheme could result in some economic pecuniary injury to the victim (plaintiff), and plaintiff did in fact suffer injury and harm by reason of defendants' scheme in that, inter alia, he was fired; (d) the mails were used in furtherance of the scheme; and (e) the above-stated material omissions/concealments by defendants were necessary in order to fire plaintiff pursuant to their fraudulent scheme because the disclosure of such material fraudulently concealed facts to plaintiff and/or to plaintiff's employer, the NYS Economic Development Organization (as defined in paragraph 12 above), would have prevented the wrongful firing of plaintiff by the renegade and corrupt defendants and plaintiff's employer would not have fired plaintiff "but for" such material concealments.

80. Based on the foregoing, plaintiff has alleged, and will establish, beyond a preponderance of the evidence before the trier of fact, the commission of at least two (2) "criminal predicate acts" of racketeering activity, one of which occurred after the effective date of this Chapter, and the last of which occurred within ten (10) years after the commission of a prior act of racketeering activity, all as required by the 18 U.S.C. 1961 (5)."pattern of racketeering activity" requirements.

81. All of the predicate acts described above were related so as to establish a pattern of racketeering activity within the meaning of 18 U.S.C. 1962 (c) in that their common purpose was to extort and/or defraud plaintiff; their common result was to extort and/or defraud plaintiff; defendants RR, LaCivita, Regan, and Bacheller, each personally and/or through his/their agent or agents, directly or indirectly, participated in all of the above acts and employed the same or similar methods of commission; plaintiff was the victim of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events. All of the predicate acts described above were continuous so as to form a pattern of racketeering activity and are part of a larger continuity of racketeering activity in that, upon information and belief (see the next paragraph herein where discovery is sought to "flesh out" the relevant facts): (a) defendants engaged in similar predicate acts against victims other than plaintiff over a substantial period of time in the past; and/or (b) the pattern of criminal racketeering activity engaged in by defendants against plaintiff continues and/or threatens to continue in the future against other victims because the above racketeering activities constitute defendants' regular way of conducting ongoing business at ESD insofar as the four (4) highest-ranking senior management public officials of ESD in the Albany ESD Office directly participated in the above racketeering activities, **as a matter of senior decision-making policy,** thereby establishing, without more, the requisite threat of continuity, and continuation into the future.

82. Plaintiff respectfully seeks leave to conduct discovery in order to uncover other violations of 18 U.S.C. 1961 (1). Upon information, there exist other similarly-victimized persons in the Albany ESD Office who have been abused by RR and subjected to the

same conspiratorial tactics that plaintiff has been subjected to, and, given the corrupt

power of defendants, plaintiff needs to conduct discovery to compel such persons to

come forward and to tell the truth about the continuing conspiracy inflicted by defendants

not only against plaintiff, but also against other similarly-situated individuals in the

Albany ESD Office.

83. At all relevant times, the enterprise alleged above (ESD) was engaged in, and its

activities affected, interstate commerce and foreign commerce.

84. By reason of the foregoing, plaintiff is entitled to punitive and exemplary damages

against defendants, and against each of them, to punish them and deter them from such

behavior in the future,  because their wrongful conduct against plaintiff amounts to high

moral, intentional, and malicious culpability, because their conduct offends the public

interest and/or is aimed at the public generally and/or would be in the future, and because

such punitive damages will deter defendants, and each of them, from engaging in similar

outrageous conduct in the future against others. The wrongdoing complained of rises to

the level of such wanton dishonesty as to imply a criminal indifference to civil

obligations. It involves intentional and malicious moral turpitude, malice, oppression,

insult, and gross, willful, willing and wanton disregard of plaintiff's rights. The wrongs

complained of are morally culpable, and actuated by evil and reprehensible motives.

85. By reason of the foregoing, plaintiff is entitled to Judgment as follows:

      1. granting an award of compensatory damages against defendants and

each of them, individually, jointly, and severally, in the sum of $1,000,000, constituting

the amount in which plaintiff has been injured in his business and/or property by reason

of defendants' above racketeering activity, and/or will be so damaged in the future,

including, without limitation, the loss of plaintiff's gainful employment and the loss of

plaintiff's professional position and reputation, lost employment and lost wages, lost

health insurance and COBRA expenses, damage to plaintiff's professional reputation and

professional status in the community, damages involving plaintiff's inability to find new

gainful employment by reason of defendants' racketeering injury and wrongful

discharge/firing of plaintiff;

       2. granting an award trebling the damages set forth in sub-paragraph 1

above pursuant to 18 U.S.C. 1964 (c);

       3. granting an award of punitive damages in the sum of $5,000,000.00

against defendants, and each of them; and granting an award trebling those damages

pursuant to 18 U.S.C. 1964 (c);

       4. granting an award of pre-judgment interest on the damages and/or

losses that plaintiff has sustained and/or will sustain in the future;

       5. granting equitable injunctive relief requiring defendants, or their

successors, in their governmental public official capacities, and/or the Department of

Economic Development and/or Empire State Development to reinstate plaintiff as an

employee at his last salary and health benefits, together with back-pay and

reimbursement for his COBRA expenses if such relief (back-pay and COBRA

reimbursement) are permissible under the 11th Amendment to the Constitution;

       6. granting plaintiff an award of all costs of litigation incurred by plaintiff,

including reasonable attorneys' fees pursuant to 18 U.S.C. 1964 (c); and

       7. granting such other and further relief as this Court deems just and

proper.

## SECOND CLAIM AND CAUSE OF ACTION

### 42 U.S.C. 1983 Civil Claim
### For Deprivation of Civil Rights

86. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 85 above, as if set forth at length herein. This Claim is asserted against defendants in their individual and personal capacities, except for the allegations seeking injunctive relief and prospective reinstatement (together with the ancillary relief of a grant of attorneys fees against the State), which are asserted against defendants in their governmental public official capacities as agents of the State.

87. 42 U.S.C. 1981(a) provides in relevant part: "All persons within .... The United States shall have the same right in every State and Territory to make and enforce contracts, **to sue, be parties, give evidence, [emphasis added]** and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ...".

88. To state a claim for relief in an action brought under 18 U.S.C. 1983, plaintiff must establish that he was deprived of a right secured by the Constitution or Laws of the United States by reason of retaliation against plaintiff (wrongful discharge in the case at bar) for exercising such right, and that the alleged deprivation was committed by state officials under color of State law.

89. In the case at bar:

(a) plaintiff's free speech and/or free expression rights, and/or plaintiff's property rights in (1) putting his August 24, 2006 workplace grievance on the record via email to

his Boss, (2) notifying defendants, by emails and verbally, that he objected to and

protested their corrupt wrongdoing, and that he would exercise his right of access to the

federal courts and bring suit against them in federal court and testify in federal court

against them if they persisted in their corrupt criminal  extortion conspiracy against

plaintiff (which conspiracy was intended either to compel plaintiff to execute the

Extortion Document, or wrongfully discharge/fire plaintiff without just cause  if he

refused to accede to their extortionate demands to execute the Extortion Document), and

(3) gaining access to the federal courts and suing defendants in the federal courts, were

all property interests and/or rights protected by the Constitution and Laws of the United

States, including, without limitation, plaintiff's free speech rights and/or property rights

with respect to plaintiff's right to put on record a legitimate workplace grievance,

plaintiff's  right of access to the courts, plaintiff's right to protest and object to the

corrupt conduct of defendants, plaintiff's right to sue defendants in federal court, and

plaintiff's rights to free speech and protest on matters of public concern regarding the

corrupt manner in which defendant public officials were abusing their public trust and

engaging in wrongful and/or criminal conduct against plaintiff, all of which rights are

constitutionally-protected rights under the Article IV Privileges and Immunities Clause of

the Constitution, under the First Amendment to the Constitution, under the 5th

Amendment Due Process Clause to the Constitution, under the 14th Amendment Equal

Protection and Due Process Clauses to the Constitution, and under other provisions of the

Constitution and/or Laws of the United States;.

(b) defendants wrongfully discharged/fired plaintiff without just cause, under

color of State law, solely in retaliation against plaintiff for exercising his above

constitutionally-protected rights, activities and free speech and by reason of his refusal to

execute the Extortion Document pursuant to which defendants attempted to "squelch"

plaintiff's above constitutionally-protected rights, which was the proximate, directly, and

"but for" cause, and only cause, for his firing – since plaintiff, at all relevant times, did

his job in a professional manner and there never existed any legitimate and/or just cause

for his discharge/firing;

      (c) defendants thereby, under color of State law, subjected plaintiff to the

deprivation of his constitutionally-protected federal rights in violation of 18 U.S.C 1983;

and

      (d) it is well established that senior, high-ranking public officers/officials may not

retaliate against their low-level employees for the exercise of their constitutionally-

protected rights.

90. Plaintiff's above constitutionally-protected free speech rights, and other

constitutionally-protected rights and activities involve and raise many matters of public

concern and importance, and plaintiff's interest in speaking out, protesting, objecting to,

and expressing himself on these matters of public concern and importance regarding

high-ranking political corruption and criminal activity far outweigh the purported interest

of NYS Government and/or the NYS Economic Development Organization in the

"efficiency of the public services it performs". In fact, such above free speech

expressions by plaintiff in no way impeded or otherwise interfered with, in any manner,

the legitimate proper and efficient functioning of  NYS Government and/or of the NYS

Economic Development Organization. Plaintiff's "speech", such as set forth herein, was

aimed at exposing improper operations and/or questioning the integrity of government

officials and clearly concerns the public interest, especially where, as here, such "speech" protested and/or exposed criminal wrongdoing and/or malfeasance on the part of government officials in the performance of their official duties. The public interest and concern regarding the integrity of public officials is firmly established. Clearly, speech questioning the integrity of public officials is of public concern.

91. The above corrupt conduct and lack of integrity of high-ranking NYS Economic Development Organization public officials aimed at a low-level public employee is plainly a matter of public concern, and plaintiff is entitled to speak out, protest, object to, and express himself as an outraged public citizen about the above criminal conspiracy being conducted by such high-ranking public officials. Indeed, the Community/Voting Electorate should be, and is, very concerned about such NYS government corruption at high levels. Indeed, prior to being wrongfully discharged/fired, plaintiff spoke with his Boss, David Ahl, and complained to David Ahl, who related such free speech statements to defendants, that the corrupt criminal conspiracy in which defendants were engaged in against plaintiff was clearly of public concern and interest in view of the fact that it represented public corruption and lack of integrity at the highest levels of the NYS Economic Development Organization in Albany and plaintiff told David Ahl, who related these free speech statements to defendants as well, that plaintiff would bring a civil criminal corruption conspiracy suit under RICO in federal court against defendants, for the public benefit in that the NYS Ecomonic Development Organization in Albany was infected with public corruption and in that defendants were violating their sacred public trust, if plaintiff was fired. Moreover, prior to his discharge, plaintiff told both David Ahl and defendant LaCivita that defendants were violating his Constitutional 1st Amendment

free speech rights by threatening to fire plaintiff in retaliation for plaintiff's exercising his free speech rights in lodging his workplace grievance against RR and in exercising his free speech rights to protest and object to defendants' wrongful, corrupt and criminal conspiracy to protect RR and to silence plaintiff. Moreover, in his August 24 email to his Boss, David Ahl, annexed hereto in Exhibit 2, plaintiff stated that, if he was wrongfully discharged, "I will put a major klieg light on exactly what is wrong with purported government in NYS". Likewise, in a September 30, 2006 email to David Ahl, defendant Regan, and defendant LaCivita, plaintiff stated as follows: "For the record, I really do not appreciate the manner in which I was treated on September 5, two days before my surgery, by this Office …. It was shoddy, unprofessional, and insulting, and, the way I see it, and the way I think a jury would see it, it constituted a clear and intentional attempt to intimidate me, two days before my surgery, into signing this absurd document that Joe gave me on 9/5 just before I left for the day on 9/5 in order to rest for my surgery. …..Bob [defendant Regan] I have to be honest. I think you should be ashamed of yourself. On an attorney/client basis, I approached you well prior to 9/5 and explained to you, briefly, the malicious workplace abuse that was being visited on me irrationally, for no justifiable reason, by Ray Richardson – just irrational, unjustifiable abuse in the workplace … Bob, Why am the subject of this persecution? Why are you not considering either firing or disciplining Ray Richardson for the sadistic abuse charges and workplace grievances that I have put on the record against him and told you about personally? I have been told by my attorney that you told my attorney that ESD wants to fire me !!!! You all have it backwards, totally backwards……. **YOU ALL HAVE IT TOTALLY BACKWARDS AND, IF NECESSARY, IT WILL NOT BE DIFFICULT TO**

**MAKE CERTAIN THAT A JURY "GETS" WHAT IS REALLY GOING ON**

**HERE .....** I just had cancer surgery and should be at home recuperating [it was a

Saturday]. Why am I forced to come into this Office to defend myself against your threats

of firing me ??? – it is totally backwards. You should all be ashamed of yourselves ...".

Likewise, by email dated September 30, 2006 to David Ahl and defendants Regan and

LaCivita, plaintiff stated: "One of the actionable claims/causes of action to be asserted

against [defendants] ...., if I were to be fired, would be **CONSPIRACY TO PROTECT**

**MR. RICHARDSON AND TO PERSECUTE ME. .....** Finally, I have no idea if any

crimes have been committed here because I am totally ignorant about the NYS criminal

law as it relates to **abuses by NYS public officials of their official duties and breaches**

**by NYS public officials of their public trust [emphasis added]."** Likewise, by email

dated Sunday October 1, 2006 to David Ahl, defendant Regan, and defendant LaCivita,

plaintiff stated as follows: " ... if I am fired....., if so advised by legal counsel, [you] may

be sued and/or charged ..... in the public forum, with operating as a NYS governmental

conspiratorial cabal constituting the civil and/or criminal equivalent of a white-collar

NYS government organized crime family ....". Likewise, by email dated October 2, 2006

to David Ahl and to defendants Regan, LaCivita, and Bacheller, plaintiff stated as

follows:

"Bob Regan, the ESD General Counsel, told my attorney, in no uncertain terms, that if I
did not sign that [9/5 document] shoved in my face by Joe Lacivita on 9/5, as I was
leaving to rest for my surgery on 9/7, then, in such event, I would be fired by ESD. .....I
am not going to sign that [9/5 document], so make up your minds. .... You all have it
totally ass-backwards, as I previously explained. Make up your minds."

92. In addition to the violations of his 1st Amendment rights, defendants, by their above

behavior and criminal conspiracy, under color of State law, have subjected plaintiff to the

deprivation of his constitutionally-protected property and/or liberty rights in violation of

18 U.S.C 1983 and 18 U.S.C. 1985, whereby plaintiff has been injured and damaged in

that he has lost his professional employment, his professional reputation in the

community, and his ability to obtain gainful employment in the future. Indeed, one the

overt acts undertaken in furtherance of defendants' criminal conspiracy was the wrongful

discharge/firing of plaintiff without just cause. By such actions, defendants have deprived

plaintiff of his constitutionally-protected right of "liberty" and plaintiff is entitled to

damages therefor. The law is clear that where, as in the case at bar, a plaintiff's good

name, reputation, honor, or integrity is at stake by reason of his wrongful discharge, or,

under color of State law, defendants have imposed on plaintiff, by wrongful discharge, a

stigma or other disability that forecloses plaintiff's freedom to take advantage of other

employment opportunities, plaintiff is entitled sue for damages caused by reason of

defendants' deprivation of his "liberty" protected under the Due Process Clause of the

14th Amendment pursuant to 42 USC 1983.

93. By reason of the foregoing, plaintiff is entitled to punitive and exemplary damages

against defendants, and against each of them, to punish them and deter them from such

behavior in the future,  because their wrongful conduct against plaintiff amounts to high

moral, intentional, and malicious culpability, because their conduct offends the public

interest and/or is aimed at the public generally and/or would be in the future, and because

such punitive damages will deter defendants, and each of them, from engaging in similar

outrageous conduct in the future against others. The wrongdoing complained of rises to

the level of such wanton dishonesty as to imply a criminal indifference to civil

obligations. It involves intentional and malicious moral turpitude, malice, oppression,

insult, and gross, willful, willing and wanton disregard of plaintiff's rights. The wrongs complained of are morally culpable, and actuated by evil and reprehensible motives.

94. By reason of the foregoing, defendants, and each of them, are liable to plaintiff at law and in equity for redress as follows pursuant to 42 U.S.C. 1983.

95. By reason of the foregoing, plaintiff is entitled to Judgment as follows:

 1. granting an award of compensatory damages against defendants and each of them, individually, jointly, and severally, in the sum of $1,000,000, constituting the amount in which plaintiff has been injured and damaged in his business and/or property by reason of defendants' above wrongdoing, and/or will be so damaged in the future, including, without limitation, the loss of plaintiff's gainful employment and the loss of plaintiff's professional position and reputation, lost employment and lost wages, lost health insurance and COBRA expenses, damage to plaintiff's professional reputation and professional status in the community, damages involving plaintiff's inability to find new gainful employment by reason of defendants' wrongdoing and wrongful discharge/firing of plaintiff;

 2. granting an award of punitive damages in the sum of $5,000,000.00 against defendants, and each of them;

 3. granting an award of pre-judgment interest on the damages and/or losses that plaintiff has sustained and/or will sustain in the future;

 4. granting equitable injunctive relief against defendants in their governmental official capacities as agents of the State, and/or against their successor governmental public officials as agents of the State, and against the NYS Department of Economic Development/Empire State Development, and against the State itself, requiring such

defendant public officials, as agents of the State, and/or the State itself, to reinstate plaintiff, on a prospective basis, as an employee of the State at his last position, salary and health benefits  prior to his wrongful termination, together with back-pay and reimbursement for his COBRA expenses (if such award of back-pay and COBRA reimbursement does not violate the 11th Amendment to the Constitution);

5. granting plaintiff an award of all costs of litigation incurred by plaintiff, including reasonable attorneys' fees, which award is sought against defendants in their governmental official capacities as agents of the State, and/or against the State itself, and is sought as ancillary relief pursuant to the grant of prospective reinstatement relief against the State; and

6. granting such other and further relief as this Court deems just, proper.


■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■ ■

## THIRD CLAIM AND CAUSE OF ACTION

### 42 U.S.C. 1985(2) Civil Claim For
### Conspiracy to Interfere With Civil Rights

96. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 95 above, as if set forth at length herein. This Claim is asserted against defendants in their individual and personal capacities, except for the allegations seeking injunctive relief and prospective reinstatement (together with the ancillary relief of a grant of attorneys fees against the State), which are asserted against defendants in their governmental public official capacities as agents of the State.

97. By reason of the foregoing, (a) defendants conspired, under color of State law, to

deter, by intimidation and/or threat, plaintiff from attending a court of the United States,

and/or from testifying, freely, fully, and truthfully in a federal court legal proceeding;

and/or (b) defendants conspired, under color of State law, for the purpose of impeding,

hindering, obstructing, or defeating, in any manner, the due course of justice in this New

York State, with intent to deny plaintiff the equal protection of the laws, all in violation

of 42 U.S.C 1985 (2).

98. Defendants and each of them were engaged in the above conspiracy in violation of 42

U.S.C. 1985 (2), and did, or cause to be done, an act and/or acts in furtherance of the

objects of the above conspiracy, whereby plaintiff was directly and proximately injured

in his person and/or property and/or plaintiff was deprived of having and exercising the

rights and privileges of a citizen of the United States.

99. Based on the foregoing, plaintiff, as the party so injured and deprived, is entitled to

damages caused by such injury and deprivation against defendants and each of them.

100. By reason of the foregoing, plaintiff is entitled to punitive and exemplary damages

against defendants, and against each of them, to punish them and deter them from such

behavior in the future, because their wrongful conduct against plaintiff amounts to high

moral, intentional, and malicious culpability, because their conduct offends the public

interest and/or is aimed at the public generally and/or would be in the future, and because

such punitive damages will deter defendants, and each of them, from engaging in similar

outrageous conduct in the future against others. The wrongdoing complained of rises to

the level of such wanton dishonesty as to imply a criminal indifference to civil

obligations. It involves intentional and malicious moral turpitude, malice, oppression,

insult, and gross, willful, willing and wanton disregard of plaintiff's rights. The wrongs complained of are morally culpable, and actuated by evil and reprehensible motives.

101. By reason of the foregoing, plaintiff is entitled to Judgment as follows:

 1. granting an award of compensatory damages against defendants and each of them, individually, jointly, and severally, in the sum of $1,000,000, constituting the amount in which plaintiff has been injured and damaged in his business and/or property by reason of defendants' above wrongdoing, and/or will be so damaged in the future, including, without limitation, the loss of plaintiff's gainful employment and the loss of plaintiff's professional position and reputation, lost employment and lost wages, lost health insurance and COBRA expenses, damage to plaintiff's professional reputation and professional status in the community, damages involving plaintiff's inability to find new gainful employment by reason of defendants' racketeering injury and wrongful discharge/firing of plaintiff;

 2. granting an award of punitive damages in the sum of $5,000,000.00 against defendants, and each of them;

 3. granting an award of pre-judgment interest on the damages and/or losses that plaintiff has sustained and/or will sustain in the future;

 4. granting equitable injunctive relief against defendants in their governmental official capacities as agents of the State, and/or against their successor governmental public officials as agents of the State, and against the NYS Department of Economic Development/Empire State Development, and against the State itself, requiring such defendant public officials, as agents of the State, and/or the State itself, to reinstate plaintiff, on a prospective basis, as an employee of the State at his last position, salary

and health benefits  prior to his wrongful termination, together with back-pay and

reimbursement for his COBRA expenses (if such award of back-pay and COBRA

reimbursement does not violate the 11th Amendment to the Constitution);

     5. granting plaintiff an award of all costs of litigation incurred by plaintiff,

including reasonable attorneys' fees, which award is sought against defendants in their

governmental official capacities as agents of the State, and/or against the State itself, and

is sought as ancillary relief pursuant to the grant of prospective reinstatement relief

against the State; and

     6. granting such other and further relief as this Court deems just, proper.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

## FOURTH CLAIM AND CAUSE OF ACTION

## COMMON LAW TORTIOUS AND CRIMINAL CONSPIRACY

## PRIMA FACIE TORT

102. Plaintiff repeats and reallges each and every allegation set forth in paragraphs 1

through 101 above, as if set forth at length herein. This Claim is asserted against

defendants in their individual and personal capacities.

102. By reason of the foregoing, plaintiff is entitled to punitive and exemplary damages

against defendants, and against each of them, to punish them and deter them from such

behavior in the future,  because their wrongful conduct against plaintiff amounts to high

moral, intentional, and malicious culpability, because their conduct offends the public

interest and/or is aimed at the public generally and/or would be in the future, and because

such punitive damages will deter defendants, and each of them, from engaging in similar

outrageous conduct in the future against others. The wrongdoing complained of rises to

the level of such wanton dishonesty as to imply a criminal indifference to civil

obligations. It involves intentional and malicious moral turpitude, malice, oppression,

insult, and gross, willful, willing and wanton disregard of plaintiff's rights. The wrongs

complained of are morally culpable, and actuated by evil and reprehensible motives.

103. By reason of the foregoing conspiracy, plaintiff was damaged and is entitled to

compensatory damages as follows:

104. By reason of the foregoing, plaintiff is entitled to Judgment as follows:

     1. granting an award of compensatory damages against defendants and each of

them, individually, jointly, and severally, in the sum of $1,000,000, constituting the

amount in which plaintiff has been injured and damaged in his business and/or property

by reason of defendants' above wrongdoing, and/or will be so damaged in the future,

including, without limitation, the loss of plaintiff's gainful employment and the loss of

plaintiff's professional position and reputation, lost employment and lost wages, lost

health insurance and COBRA expenses, damage to plaintiff's professional reputation and

professional status in the community, damages involving plaintiff's inability to find new

gainful employment by reason of defendants' racketeering injury and wrongful

discharge/firing of plaintiff;

     2. granting an award of punitive damages in the sum of $5,000,000.00 against

defendants, and each of them;

3. granting an award of pre-judgment interest on the damages and/or losses that plaintiff has sustained and/or will sustain in the future;

4. granting plaintiff an award of all costs of litigation incurred by plaintiff, including reasonable attorneys' fees; and

5. granting such other and further relief as this Court deems just and proper.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

## FIFTH CLAIM AND CAUSE OF ACTION

### COMMON LAW ACTION FOR INTENTIONAL, MALICIOUS, AND SADISTIC INTENTIONAL INFLICTION OF MENTAL/EMOTIONAL AND PHYSICAL ABUSE

105. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 104 above, as if set forth at length herein. This Claim is asserted against defendants in their individual and personal capacities.

106. Defendant, and each of them, by reason of their above wrongful actions, inflicted severe emotional distress and mental anguish upon plaintiff, to wit:

(a) the original campaign of sadistic and malicious infliction of mental distress by defendant RR was egregious and outrageous, particularly since part of such mental abuse was visited upon plaintiff at times when RR knew that plaintiff had been diagnosed with prostate cancer and knew that plaintiff would be having major surgery to remove his cancerous prostate gland on September 7, 2006;

(b) the subsequent extortion scheme and criminal conspiracy by defendants against plaintiff in order to protect RR, persecute plaintiff, cover-up RR's wrongdoing, and extort plaintiff to execute the Extortion Document was egregious and outrageous,

67

particularly since such mental abuse was visited upon plaintiff at times when defendants, and each of them, knew that plaintiff had been diagnosed with prostate cancer and knew that plaintiff would be having major surgery to remove his cancerous prostate gland on September 7, 2006 (the September 5, 2006 orchestrated conspiratorial effort by defendants to intimidate/extort plaintiff into signing the Extortion Document the day before he was leaving for Manhattan for his prostate surgery at Memorial Sloan-Kettering Hospital was particularly egregious and outrageous); and

(c) defendants' post-surgical behavior to plaintiff when plaintiff returned to his home in Troy, NY and returned to work on September 26, 2006 was egregious and outrageous in that, inter alia, at such times, while plaintiff was doing his best to heal from his surgery and was suffering the debilitating post-surgery consequences of such surgery, defendants continued their conspiratorial extortion scheme and conspiracy against plaintiff, refused to negotiate in good faith with plaintiff about a fair and just manner in which to resolve the workplace abuse incidents on a fair and reasonable basis, refused to bring RR to account for his sadistic and malicious workplace abuse against plaintiff, and continued their intimidation/extortion scheme to intimidate plaintiff into signing the Extortion Document while plaintiff was doing his best to heal and recover, was doing his job on a professional basis, and, in addition, on a good faith basis, was trying to reach a reasonable resolution of subject workplace abuse incidents by drafting and delivering to defendants reasonable documents of resolution (the drafting of which totally exhausted plaintiff given his post-sugical condition), which defendants totally ignored and refused to address in any good faith manner in furtherance of their continuing criminal conspiracy to extort/intimidate plaintiff into signing the Exortion Document; and

(d) defendants' post-surgical behavior to defendant was egregious and outrageous in that **they never intended to deal with plaintiff on a good faith basis and never intended to consider in good faith any resolution of the subject workplace abuse incidents on any basis other than extorting/intimidating plaintiff into signing the Extortion Document**, but, in bad faith and with sadisitic and malicious intent, led plaintiff on and pretended that they would consider, on a good faith basis, the draft settlement documents that plaintiff was preparing and delivering to defendants, while, at the same time, plaintiff was trying to heal from his surgery and doing his job on a professional basis; this bad faith course of behavior by defendants caused plaintiff extreme mental distress and mental and emotional and physical distress because it was extremely difficult and exhausting for plaintiff, in his post-surgical state and with the complications of his surgery, to do all three (3) things at once: (1) heal and recuperate from his surgery; (2) do his job in a professional manner (which plaintiff did); and (3) draft and prepare complicated legal documents, in good faith, in order to attempt to reach a reasonable resolution of the subject workplace abuse incidents; indeed, this three-pronged effort totally exhausted plaintiff and caused plaintiff to suffer severe emotional, mental, and physical distress and mental anguish;

(e) defendants' post-surgical behavior in wrongfully discharging/firing plaintiff in sole retaliation for his refusal to accede to their demands to sign the Extortion Document was egregious and outrageous, particularly in view of the manner in which plaintiff was fired (to be fleshed out in discovery) and defendant's refusal to give plaintiff any legitimate reason or allegedly just cause for his firing; and

(f) defendants' wrongful discharge/firing of plaintiff without just cause or reason was egregious and outrageous in that defendants knew that plaintiff was having severe financial problems and would have great difficulty in finding and new job in view of, inter alia, the damage to his reputation caused by the wrongful discharge without just cause. Again, this wrongful firing was an overt act in defendant's continuing criminal conspiracy to protect RR at all costs and to persecute plaintiff – and to attempt to ensure that plaintiff would lack the financial wherewithal to sue defendants for their egregious and outrageous behavior by depriving plaintiff of his salaried income, health benefits, etc.

107. Freedom from mental disturbance in the workplace is a protected interest in this State. It is fundamental to our common-law system that one may seek redress for every substantial wrong and that the wrongdoer is responsible for the natural and proximate consequences of his misconduct. Defendants, and each of them, have intentionally inflicted mental abuse and emotional distress upon plaintiff by means of their above actions and criminal conspiracy:

(a) defendants, and each of them, as set forth above, have engaged in extreme and outrageous conduct against plaintiff;

(b) defendants, and each of them, have intentionally intended to cause severe mental abuse and severe emotional distress upon plaintiff;

(c) the actions of defendants, and each of them, has been the direct and proximate cause of plaintiff's sever emotional distress; and

(d) by reason of above actions and criminal conspiracy of defendants, and each of them, plaintiff has suffered severe mental abuse, severe emotional distress, and severe mental pain and anguish.

108. The above actions and behavior of defendants, and each of them, which constitute a

deliberate and malicious campaign of harassment and intimidation, has been so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and must be regarded as atrocious and utterly intolerable in a civilized

community. Defendants, and each of them, have, by his/their extreme and outrageous

conduct, intentionally and maliciously caused sever emotional distress to plaintiff and are

subject to liability for such infliction of emotional distress.

109. By reason of the foregoing, plaintiff is entitled to punitive and exemplary damages

against defendants, and against each of them, to punish them and deter them from such

behavior in the future, because their wrongful conduct against plaintiff amounts to high

moral, intentional, and malicious culpability, because their conduct offends the public

interest and/or is aimed at the public generally and/or would be in the future, and because

such punitive damages will deter defendants, and each of them, from engaging in similar

outrageous conduct in the future against others. The wrongdoing complained of rises to

the level of such wanton dishonesty as to imply a criminal indifference to civil

obligations. It involves intentional and malicious moral turpitude, malice, oppression,

insult, and gross, willful, willing and wanton disregard of plaintiff's rights. The wrongs

complained of are morally culpable, and actuated by evil and reprehensible motives.

110. By reason of the foregoing, plaintiff is entitled to Judgment as follows against

defendants and each of them, individually, jointly, and severally:

(a) plaintiff has been damaged and traumatized by financial fear caused by the

above conduct of defendants, and each of them, and is entitled to compensatory damages

in the sum of $5,000,000.00 for such damage and emotional trauma (including, without

limitation, insomnia, nightmares, fright , fear, headaches, indignity, humiliation, and wounded feelings); such damages are necessary in order to compensate plaintiff for his severe and great mental, emotional, and physical pain, injury, distress, and mental anguish caused by defendants;

(b):Plaintiff is entitled to an award of compensatory damages against defendants and each of them, individually, jointly, and severally, in the sum of $1,000,000, constituting the amount in which plaintiff has been injured and damaged in his business and/or property by reason of defendants' above wrongdoing, and/or will be so damaged in the future, including, without limitation, the loss of plaintiff's gainful employment and the loss of plaintiff's professional position and reputation, lost employment and lost wages, lost health insurance and COBRA expenses, damage to plaintiff's professional reputation and professional status in the community, damages involving plaintiff's inability to find new gainful employment by reason of defendants' wrongful discharge/firing of plaintiff;

(c) Plaintiff is entitled to an award of punitive damages in the sum of $5,000,000.00 against defendants, and each of them;

(d) Plaintiff is entitled to an award granting pre-judgment interest on the damages and/or losses that plaintiff has sustained and/or will sustain in the future;

(f) Plaintiff is entitled to an award granting plaintiff all costs of litigation incurred by plaintiff, including reasonable attorneys' fees; and

(g) Plaintiff is entitled to an award granting such other and further relief as this Court deems just and proper.

## SIXTH CLAIM AND CAUSE OF ACTION

### RESPONDEAT SUPERIOR

111. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1

through 110 above, as if set forth at length herein. This Claim is asserted against the

individual defendants in their governmental public official capacities as agents of Empire

State Development or its group entities (as set forth below) and/or as agents of the State

of New York, against defendant the NYS Department of Economic Development

individually, and/or as an agent and instrumentality of the State of New York, against the

NYS Empire State Development Corporation individually, and/or as an agent and

instrumentality of the State of New York, against NYS Empire State Development

individually, and/or as an agent and instrumentality of the State of New York, and against

the State of New York itself (hereinafter, in this Sixth Claim, collectively, the

"defendants").

112. Defendants and each of them are liable in damages to plaintiff by reason of the

foregoing wrongful actions of their individual defendant employees and agents in that,

the above criminal conspiracy resulted from a governmental entity policy, practice and/or

custom created, aided and abetted, promoted, tacitly authorized, and/or deliberately

tolerated, at the highest echelons of the above public governmental entities and/or by the

State's highest ranking policy-making officials.

113. Individual defendants RR, Bacheller, Regan and LaCivita are the policy-making

decision-makers at Empire State Development in Albany ("ESD"). They set official

policy at ESD. Their wrongdoing and tortious conduct is therefore institutional

wrongdoing and tortious conduct by ESD itself and ESD itself should be held liable

therefore. See, eg., Pembaur v. Cincinnati, 475 U.S. 469, 479-481 (1986):

> The conclusion that tortious conduct, to be the basis for municipal liability
> under [42 USC 1983), must be pursuant to a municipality's "official
> policy" requirement was intended to distinguish acts of the municipality
> from acts of employees of the municipality, and thereby make clear that
> municipal liability is limited to to action for which the municipality is
> actually responsible *** With this understanding it is plain that
> municipal liability may be imposed for a single decision by municipal
> policy-makers under appropriate circumstances No one has ever doubted,
> for instance, that a municipality may be liable under 1983 for a single
> decision by its properly constituted legislative body – whether or not
> that body had taken similar action in the past or intended to do so in
> the future – because even a single decision by such a body
> unquestionably constitutes an act of official government policy.

114. Likewise, in the case at bar, the wrongful acts unquestionably constitute acts of

official government policy because they were committed, pursuant to a criminal

conspiracy, by the four (4) most senior-ranking and policy-making officials at ESD in

Albany.

115. Therefore, ESD should be held liable therefor.

116. If ESD claims 11th Amendment Sovereign Immunity as an instrumentality of the

State of New York, such claim should be denied because **ESD has engaged in criminal**

**conduct in violation of federal law, and has deprived plaintiff of his constitutional**

**rights on an institutional basis, thereby making itself an outlaw not deserving of 11th**

**Amendment immunity from suit, and thereby waiving its 11th Amendment**

**immunity.** See, eg., New York City Health v. Perales, 50 F. 3rd 129, 135 (2nd Cir. 1995):

> From all this it may be seen that principles of Eleventh Amendment law
> Attempt to strike a balance between the states' sovereign immunity and the
> Supremacy of federal law [citation omitted]. A balance has been brought about
> by jurisprudential rules that permit prospective relief and bar retroactive
> relief. 'Remedies designed to end a continuing violation of federal law are
> necessary to vindicate the federal interest in assuring supremacy of

that law.' [citation omitted]. But compensatory or deterrence interests do not relate sufficiently to upholding the supremacy of federal law so as to outweigh the interest of protecting the immunity afforded the sovereign states under our republican form of government.

117. It is submitted that the above "balancing test" is significantly changed where, as in the case at bar, the institutional sovereign (ie., ESD) is acting in a criminal manner at the institutional level and as a "derelict" on the waters of the law. Under such circumstances, it is submitted, the supremacy of federal law should prevail and the criminal State instrumentality (ESD) should be deemed to have waived its sovereign immunity altogether, and should be liable for all damages and equitable relief requested, as should the State of New York, of which ESD is an integral instrumentality.

118. By reason of the foregoing, plaintiff is entitled to judgment, relief, and damages from the above-stated entities directly.

119. By reason of the foregoing, plaintiff is entitled to Judgment as follows against the NYS Department of Economic Development/Empire State Development, and against the State of New York, and each of them, individually, jointly, and severally, as follows:

(a) plaintiff has been damaged and traumatized by financial fear caused by the above conduct of defendants, and each of them, and is entitled to compensatory damages in the sum of $5,000,000.00 for such damage and emotional trauma (including, without limitation, insomnia, nightmares, fright , fear, headaches, indignity, humiliation, and wounded feelings); such damages are necessary in order to compensate plaintiff for his severe and great mental, emotional, and physical pain, injury, distress, and mental anguish caused by defendants;

(b) Plaintiff is entitled to an award of compensatory damages against defendants and each of them, individually, jointly, and severally, in the sum of $1.000,000, constituting the amount in which plaintiff has been injured and damaged in his business and/or property by reason of defendants' above wrongdoing, and/or will be so damaged in the future, including, without limitation, the loss of plaintiff's gainful employment and the loss of plaintiff's professional position and reputation, lost employment and lost wages, lost health insurance and COBRA expenses, damage to plaintiff's professional reputation and professional status in the community, damages involving plaintiff's inability to find new gainful employment by reason of defendants' wrongful discharge/firing of plaintiff;

(c) Plaintiff is entitled to an award of punitive damages in the sum of $5,000,000.00 against defendants, and each of them;

(d) Plaintiff is entitled to an award granting pre-judgment interest on the damages and/or losses that plaintiff has sustained and/or will sustain in the future;

(e) Plaintiff is entitled to an award granting equitable injunctive relief against defendants in their governmental official capacities as agents of the State, and/or against their successor governmental public officials as agents of the State, and against the NYS Department of Economic Development/Empire State Development, and against the State itself, requiring such defendant public officials, as agents of the State, and/or the State itself, to reinstate plaintiff, on a prospective basis, as an employee of the State at his last position, salary and health benefits  prior to his wrongful termination, together with back-pay and reimbursement for his COBRA expenses;

(f) Plaintiff is entitled to an award granting plaintiff all costs of litigation incurred

by plaintiff, including reasonable attorneys' fees; and

(g) Plaintiff is entitled to an award granting such other and further relief as this

Court deems just and proper.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**WHEREFORE,** plaintiff demands Judgment as set forth above against the

defendants and each of them, individually, jointly, severally, and collectively, together

with the other equitable relief requested above.

Dated: Troy, New York
November 20, 2006

BY: _____

HOWARD F. HUSUM, JR.
PLAINTIFF PRO SE
30 Belle Avenue
Troy, NY 12180
518-274-1620

**END COMPLAINT:**

1

**EXHIBIT 1 TO THE COMPLAINT**

**REFERENCED AT PAGE 10,**
**PARAGRAPH 20 OF THE COMPLAINT**

# NYS Department of Economic Development
## Management/Confidential Merit Awards Program

### Cash Merit Awards Nomination Form

## Section 1 -- Employee Identification

**Name:**  Howard F. Husum

**Title & Grade:**  Director of Industry Development, Strategic Business Div.

**Bureau/Division:**  Department of Economic Development/Empire State Dev.

**Date Prepared:**  February 28, 2006

## Section 2 -- Synopsis of Job Duties

Identify, develop and execute economic development projects intended to retain and/or create jobs in NYS, particularly in the warehouse/distribution center industry sector of the NYS economy.

## Section 3 -- Basis for Merit Award Nomination

In the pursuit of his assigned business development initiatives, Howard has demonstrated an exceptional diligence and perseverance in the performance of his duties. He has established that he is willing and able to assume exceptional responsibility in order to get the job done well and in a professional manner. He has exhibited an exceptionally strong work ethic, working early mornings, late evenings, and weekends in order to assist the Department in meeting deadlines. In addition to the fine performance of his primary duties, he has evidenced an exceptional willingness to pitch in and help other Department members meet their project deadlines in an exemplary showing of teamwork in action.

_Rater (Nominator) signature_
Raymond J. Richardson

3/6/06
date

## Section 4 -- Review and Approval

Recommended ☑        Not Recommended ☐

Comments: _I would like to see He..._

Deputy Commissioner for Administration        Date

2

## EXHIBIT 2 TO THE COMPLAINT

### REFERENCED AT PAGE 20,
### PARAGRAPH 35 OF THE COMPLAINT

**Exhibit A**

## Ahl, David

**From:** Husum, Howard
**Sent:** Thursday, August 24, 2006 8:32 AM
**To:** Ahl, David
**Subject:** RAY RICHARDSON UNJUSTIFIABLE MALICIOUS ABUSE AIMED AT ME

August 24, 2006

Dear David:

1. I am writing to you, in your capacity as Deputy Commissioner of Empire State Development, and in your capacity as my real and true Boss to whom I exclusively report to on everything I work on in this Office, to make the following record:

2. I have retained an attorney who is a world-class civil/criminal trial attorney (he has tried in excess of 100 criminal murder cases in his prior capacity as a prosecutor in a NYS District Attorney's Office). More importantly, he is my good friend.

3. If Ray Richardson, although he has no right to fire me in any event because he is not by true Boss and has no ability to intelligently evaluate my job performance (only you do), purports to fire me, I am putting you on notice that I will sue the Governor, the Chairman of Empire State Development, and everybody else in this Office, except for you.

4. In addition to all the attendant causes of action that would be created if Ray Richardson purported to fire me (has has absolutely no right to do so), such as wrongful firing, unjust discharge, etc., I would sue him for malicious and intentional inflection of mental/emotion/physical distress/abuse, and I would sue him under several other legitimate causes of action that I will not go into here.

5. Knowing that I have a serious 4-hour surgery scheduled for September 7, 2006, this man continues, as he done in the past, to attack me on a malicious and sadistic basis. It is no longer acceptable because he is single-handedly managing to raise my blood pressure to dangerous levels which will seriously jeopardize my life when I undergo my 4 hour surgery. If I should die on the operating table, arrangements have been made for a wrongful death suit, and many other lawsuits, against him.

6. It is no fun having a sadist, who purports to have the power to fire me, to constantly threaten to fire me, and put me in constant fear that I will be fired for no good reason, for no good cause, etc. This is not acceptable. And it has been going on for months.

7. As you know, this has been going on for months and I have explained most of it to you, because you are my Boss, and because I trust you, and believe that you are a man of honor and integrity.

8. As you you (I have sent you a number of emails to this effect, but not all), I have received numerous "accolades" (sp??) for my job performance from many persons in the Projects that I have worked on (that is why I sent you the Luke Rich compliment that I am a real professional). I have at least 15 of such job permformace compliments in my file, and I could get many more. Indeed, I have one from Ray Richardson himself, as you know. Even he understood from afar what a hard-worker I am, what a great work ethic I have, and what a professional I am, always doing my best for this ESD organization.

9. In addition, there are a number of people in this ESD organization that I believe would appear as witnesses on my behalf, testifying about the malicious abuse that Ray Richardson has "spewed and unleashed" on them as well. They might even become co-plaintiffs with me.

10. I have made a full record of every insulting incident of abuse I have been subjected to by Ray Richardson—I have confided in you most of this malicious abuse, but not all of it. Nobody has the right to treat me this way – who in hell does he think he is ???!!!!!!!

11. The main thing is that Ray Richardson is intentionally and maliciously putting me in a constant mental state of fear of being purportedly fired by him at his sadistic whim without any just cause or just reason. This is a terrifying ordeal to have to endure on a daily basis – especially since I am now diagnosed with prostate cancer, have scheduled surgery for September 7, and **cannot afford to have my health insurance jeopardized by a purported wrongful firing by Ray Richardson at this time on his sadistic and malicious whim.** He has no right to fire me, he has no just cause to fire me, and I will not be played with like a mouse by a grinning, sadistic cat.

12. By the way, my attorney would love to commence this lawsuit. The publicity alone would make him the most charismatic attorney in NYS. He is a master at dealing with juries. This would be a slam-dunk for me and for my attorney.

13. I hereby reserve all my rights regarding this matter, and hereby put you on notice that this communications just contains the "tip of the iceberg" of my complaints against RR and other persons in this organization. I am not mentioning a number of substantive and critical facts/complaints here because I choose not to do so for strategic reasons – but all such facts and complaints will see the light of day if I am fired by RR. There are many other things that will come to light if I am forced to commence this lawsuit, which I am not going into or even mentioning here. Please understand that this communication is written under extreme stress and duress from RR. There are many other actionable causes of action against this man, and against the organization that lets him get away with this crap, which I will not go into here.



14. Suffice it to say that I have now put Empire State Development on notice that it, the Governor, the Chairman, and everybody else in this organization (except for you) will have a major battle on their hands if Ray Richardson purports to fire me. I will put a major klieg-light on exactly what is wrong with purported government in NYS. It will be bad for ESD. It will be good for me and my attorney. All these suits would survive my death, as my attorney has the authority to prosecute them in any event.

15. My attorney also has a full record of all the relevant facts (you do not). I have kept very careful records for a number of months, since this malicious infliction of mental/emotional stress began – and RR began to threaten to fire me for no good reason or just cause, just at his arbitrary whim, for the fun of it (which fear of unjustified firing has been hanging over my head for a number of months now). The main point, for present purposes, is that RR is maliciously raising my blood pressure on the eve of my serious 4 hour surgery. This is, by definition, malicious and intentional infliction of mental/emotional/physical distress and abuse. It must stop now.

16. David: I truly apologize for burdening you with this – but you are the only person in this organization I can trust and turn to for help. As I said, I would never sue you or involve you in any way in this fight.

Very truly yours,
Howard F. Husum, Jr.
Potential Plaintiff

3

## EXHIBIT 3 TO THE COMPLAINT

### REFERENCED AT PAGE 24,
### PARAGRAPH 43 OF THE COMPLAINT

 Development



I, Howard F. Husum, Jr., acknowledge that I submitted the attached document (marked "EXHIBIT A") via e-mail to David Ahl, Deputy Commissioner, Empire State Development Corporation, on August 24, 2006, and hereby retract the claims and allegations made therein. I also hereby release the State of New York, its subsidiaries, agencies, departments, corporate entities, officers and employees thereof, and or its agents and assigns, specifically New York State Department of Economic Development, its officers and employees, and or its agents and assigns, Empire State Development Corporation, its officers and employees, and or its agents and assigns, New York State Urban Development Corporation, its officers and employees, and or its agents and assigns, and any and all successors of such entities and persons from any and all claims, actions, causes of action, suits, civil rights proceedings and/or actions (administratively or through the Courts), Civil Service Law Appeals, Civil Practice Law Article 78 Proceedings, sums of money, accounts, reckonings, covenants, contracts, controversies, agreements, promises, damages, judgments, extents, executions, claims for personal injury, wrongful death, wrongful firing, unjust discharge, malicious and/or intentional infliction of mental, emotional or physical distress and or abuse, property damage and demands whatsoever, in law or in equity in which I or my heirs, executors, administrators, successors and or assigns ever had, now have or hereinafter can, shall or may have against, upon or by reason of the State of New York, its agencies, departments, corporate entities and officers and employees thereof, and or its agents and assigns, specifically New York State Department of Economic Development, its officers and employees, and or its agents and assigns, Empire State Development Corporation, its officers and employees and or its agents and assigns, New York State Urban Development Corporation, its officers and employees, and or its agents and assigns, and any and all successors of such entities and persons whatsoever from the beginning of the world to the day of the date of this statement.

I further acknowledge that I am fully aware of all of my legal rights and make this statement of my own free will, without pressure, coercion or threat.

_____
Howard F. Husum, Jr.,

WITNESS: _____
Joseph La Civita
Deputy Commissioner
Empire State Development Corp.

Date:

_____
Date

**New York State Department of Economic Development**
30 South Pearl Street  Albany  New York  12245  Tel 518 292 5100
Website  www.empire.state.ny.us

**Exhibit A**

## Ahl, David

**From:** Husum, Howard
**Sent:** Thursday, August 24, 2006 8:32 AM
**To:** Ahl, David
**Subject:** RAY RICHARDSON UNJUSTIFIABLE MALICIOUS ABUSE AIMED AT ME

August 24, 2006

Dear David:

1. I am writing to you, in your capacity as Deputy Commissioner of Empire State Development, and in your capacity as my real and true Boss to whom I exclusively report to on everything I work on in this Office, to make the following record:

2. I have retained an attorney who is a world-class civil/criminal trial attorney (he has tried in excess of 100 criminal murder cases in his prior capacity as a prosecutor in a NYS District Attorney's Office). More importantly, he is my good friend.

3. If Ray Richardson, although he has no right to fire me in any event because he is not by true Boss and has no ability to intelligently evaluate my job performance (only you do), purports to fire me, I am putting you on notice that I will sue the Governor, the Chairman of Empire State Development, and everybody else in this Office, except for you.

4. In addition to all the attendant causes of action that would be created if Ray Richardson purported to fire me (has has absolutely no right to do so), such as wrongful firing, unjust discharge, etc., I would sue him for malicious and intentional inflection of mental/emotion/physical distress/abuse, and I would sue him under several other legitimate causes of action that I will not go into here.

5. Knowing that I have a serious 4-hour surgery scheduled for September 7, 2006, this man continues, as he done in the past, to attack me on a malicious and sadistic basis. It is no longer acceptable because he is single-handedly managing to raise my blood pressure to dangerous levels which will seriously jeopardize my life when I undergo my 4 hour surgery. If I should die on the operating table, arrangements have been made for a wrongful death suit, and many other lawsuits, against him.

6. It is no fun having a sadist, who purports to have the power to fire me, to constantly threaten to fire me, and put me in constant fear that I will be fired for no good reason, for no good cause, etc. This is not acceptable. And it has been going on for months.

7. As you know, this has been going on for months and I have explained most of it to you, because you are my Boss, and because I trust you, and believe that you are a man of honor and integrity.

8. As you you (I have sent you a number of emails to this effect, but not all), I have received numerous "accolades" (sp??) for my job performance from many persons in the Projects that I have worked on (that is why I sent you the Luke Rich compliment that I am a real professional). I have at least 15 of such job performace compliments in my file, and I could get many more. Indeed, I have one from Ray Richardson himself, as you know. Even he understood from afar what a hard-worker I am, what a great work ethic I have, and what a professional I am, always doing my best for this ESD organization.

9. In addition, there are a number of people in this ESD organization that I believe would appear as witnesses on my behalf, testifying about the malicious abuse that Ray Richardson has "spewed and unleashed" on them as well. They might even become co-plaintiffs with me.

10. I have made a full record of every insulting incident of abuse I have been subjected to by Ray Richardson—I have confided in you most of this malicious abuse, but not all of it. Nobody has the right to treat me this way – who in hell does he think he is ???!!!!!!!!

11. The main thing is that Ray Richardson is intentionally and maliciously putting me in a constant mental state of fear of being purportedly fired by him at his sadistic whim without any just cause or just reason. This is a terrifying ordeal to have to endure on a daily basis – especially since I am now diagnosed with prostate cancer, have scheduled surgery for September 7, and **cannot afford to have my health insurance jeopardized by a purported wrongful firing by Ray Richardson at this time on his sadistic and malicious whim.** He has no right to fire me, he has no just cause to fire me, and I will not be played with like a mouse by a grinning, sadistic cat.

12. By the way, my attorney would love to commence this lawsuit. The publicity alone would make him the most charismatic attorney in NYS. He is a master at dealing with juries. This would be a slam-dunk for me and for my attorney.

13. I hereby reserve all my rights regarding this matter, and hereby put you on notice that this communications just contains the "tip of the iceberg" of my complaints against RR and other persons in this organization. I am not mentioning a number of substantive and critical facts/complaints here because I choose not to do so for strategic reasons – but all such facts and complaints will see the light of day if I am fired by RR. There are many other things that will come to light if I am forced to commence this lawsuit, which I am not going into or even mentioning here. Please understand that this communication is written under extreme stress and duress from RR. There are many other actionable causes of action against this man, and against the organization that lets him get away with this crap, which I will not go into here.

14. Suffice it to say that I have now put Empire State Development on notice that it, the Governor, the Chairman, and everybody else in this organization (except for you) will have a major battle on their hands if Ray Richardson purports to fire me. I will put a major klieg-light on exactly what is wrong with purported government in NYS. It will be bad for ESD. It will be good for me and my attorney. All these suits would survive my death, as my attorney has the authority to prosecute them in any event.

15. My attorney also has a full record of all the relevant facts (you do not). I have kept very careful records for a number of months, since this malicious infliction of mental/emotional stress began – and RR began to threaten to fire me for no good reason or just cause, just at his arbitrary whim, for the fun of it (which fear of unjustified firing has been hanging over my head for a number of months now). The main point, for present purposes, is that RR is maliciously raising my blood pressure on the eve of my serious 4 hour surgery. This is, by definition, malicious and intentional infliction of mental/emotional/physical distress and abuse. It must stop now.

16. David: I truly apologize for burdening you with this – but you are the only person in this organization I can trust and turn to for help. As I said, I would never sue you or involve you in any way in this fight.

Very truly yours,
Howard F. Husum, Jr.
Potential Plaintiff